Jerry S. WARDLOW, Appellant,

v.

STATE of Alaska, Appellee.

No. A–6988.

Court of Appeals of Alaska.

June 2, 2000.

---

**42.** Neither party has argued that any aggravating or mitigating factors would apply to this case.

William F. Dewey, Anchorage, for Appellant.

John A. Scukanec, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Bruce M. Botelho, Attorney General, Juneau, for Appellee.

Before COATS, Chief Judge, and MANNHEIMER and STEWART, Judges.

*OPINION*

MANNHEIMER, Judge.

In September 1995, Jerry S. Wardlow beat, raped, and then kidnapped a woman. A jury convicted Wardlow of second-degree assault, two counts of first-degree sexual assault, and kidnapping.[1] For these crimes, Superior Court Judge Milton M. Souter sentenced Wardlow to a composite sentence of 60 years to serve.

Wardlow now appeals his convictions and his sentence. He alleges that he was denied his right to a speedy trial under Alaska Criminal Rule 45. Wardlow also contends that the superior court should have suppressed an inculpatory statement that he made to the police following his arrest. In addition, Wardlow asserts that the superior court should not have allowed the State to introduce evidence of his previous assault on another woman. And Wardlow argues that the superior court violated the constitutional guarantee against double jeopardy when the court amended the verdict after the jurors declared that they had made a mistake when they originally announced their decision. Finally, Wardlow contends that his sentence is excessive.

For the reasons explained here, we affirm Wardlow's convictions and his sentence.

*Facts of the case*

On the evening of September 16, 1995, Jerry Wardlow and a friend of his, Shawn McManners, met S.M. in a bar in downtown Anchorage. After having a few drinks together, Wardlow, McManners, and S.M. left the bar and went to a grocery to buy beer. They then went to McManners's apartment, where they watched TV and continued drinking. At some point, McManners asked Wardlow and S.M. to leave.

Wardlow's camper was parked outside McManners's house. As he and S.M. were leaving, Wardlow asked S.M. if she wanted to have another beer with him. S.M. agreed, and she accompanied Wardlow into his camper.

Once inside the camper, Wardlow gave S.M. a beer and then sat down next to her on a bed. Wardlow then began "fidgeting". Without warning, he hit S.M. on the head with a hammer. S.M. fought back, but Wardlow started choking her, and she lost consciousness. She testified that she remembered Wardlow hitting her with the hammer at least six times.

When S.M. regained consciousness, Wardlow was tying her up with ropes and removing her shoes and pants. S.M. testified that Wardlow was angry because she had defecated and urinated in her pants while Wardlow was choking her. When Wardlow finished tying S.M. up, he raped her. S.M. testified that Wardlow penetrated her vaginally, anally, and orally.

When Wardlow finished assaulting S.M., he told her that he was going to "take [her] out the road and do whatever he want[ed] with her] for two weeks or however long [she] last[ed] without food or water, and then he was going to kill [her]." With S.M. tied up inside the camper, Wardlow went outside, hitched the camper to his truck, and drove off.

While Wardlow was driving, S.M. managed to free herself from the ropes. Using a hammer, she pried open the door of the camper. When Wardlow stopped for a red light at the intersection of the New Seward Highway and Northern Lights Boulevard, S.M. ran screaming from the camper, naked from the waist down, with her coat wrapped around her and with Wardlow's hammer still in her hand. S.M. ran toward a gas station where Anchorage Police Officer Glen Daily happened to be conducting a routine traffic stop.

Officer Daily saw S.M. running toward him, screaming that she had been raped. She pointed toward a truck pulling a camper that was stopped at the intersection. Officer Daily got into his patrol car and began pursuing Wardlow's vehicle. Daily stopped Wardlow at a parking lot off Tudor Road.

When Daily ran Wardlow's name through the police computer, he discovered that there was an outstanding felony warrant for Ward-

---

1. AS 11.41.210(a), AS 11.41.410(a), and AS 11.41.300(a), respectively.

low's arrest. Daily arrested Wardlow on this warrant and placed him in the patrol car. At this time, he did not advise Wardlow of his *Miranda* rights[2], nor did he interrogate Wardlow. While Daily was driving Wardlow to the police station, Wardlow asked where he was being taken. Daily replied that he was taking Wardlow to the police station at Tudor Road and Bragaw Street. Wardlow then stated, "About all they can do for me at Tudor and fucking Bragaw is lick the shit off my dick."[3]

At trial, Wardlow testified to an exculpatory version of events. He claimed that S.M. had willingly come to his camper and had consented to have sex with him. According to Wardlow, they both undressed and began to have intercourse when Wardlow realized that S.M. was menstruating. Wardlow told S.M. that he was no longer interested in having sex, but that she was welcome to stay the night. S.M. went to sleep in Wardlow's sleeping bag.

As he was going to sleep, Wardlow noticed a strong odor in the trailer and realized that S.M. had defecated in his sleeping bag. Wardlow tried to wake S.M., but he was initially unable to rouse her. When he was finally was able to wake S.M., she began to struggle with him. Wardlow told S.M. that he wanted her to clean up and leave. He then went outside the camper so that she could have some privacy. Wardlow claimed that he returned to the camper 30 minutes later and, assuming that S.M. had already left, he hitched up the camper and drove off.

*Wardlow's claim that he was denied a speedy trial under Criminal Rule 45*

■ Wardlow and the State initially agreed to a trial date of August 11, 1997. When it appeared that another trial would preempt this date, Wardlow's attorney and the prosecutor met with Judge Souter to discuss alternative trial dates. The parties agreed that, as things stood, Rule 45 would expire on September 8th. The problem was that Judge Souter was scheduled to begin a vacation on August 23rd, and he would not return to work until Monday, September 15th.

Wardlow's attorney declared that she preferred to delay Wardlow's trial until after Judge Souter returned; she wanted Judge Souter to preside over the trial because of his familiarity with the pre-trial rulings on evidentiary issues. With the defense attorney's concurrence, the prosecutor filed a motion asking Judge Souter to schedule Wardlow's trial for September 22nd.

When Judge Souter received this motion, he instructed his law clerk to call Wardlow's attorney and inform her that he would not grant the continuance unless she filed a personal waiver of Rule 45 by Wardlow. The defense attorney assured the law clerk that the waiver would be forthcoming. Based on the defense attorney's assurance, Judge Souter granted the continuance, set Wardlow's trial for September 22nd, and left for vacation.

Judge Souter actually returned to his chambers on Friday, September 13th, and he checked the court file to make sure that Wardlow's Rule 45 waiver had been received. He discovered that no waiver had been filed. The judge immediately instructed his secretary to call Wardlow's attorney and remind her about the waiver. The defense attorney met with Wardlow on the next business day—Monday, September 15th—and Wardlow signed a written waiver of Rule 45. The defense attorney filed this waiver during the noon hour.

At this point, things began to unravel. Shortly after Wardlow signed the waiver, he repented his decision and he instructed his attorney to withdraw the waiver. Just before the close of business on the 15th, the defense attorney returned to court with a motion seeking to withdraw the previously filed waiver. Indeed, the defense attorney did more than simply file a motion: she made strenuous efforts to retrieve the waiver document and remove it from the court file.

---

2. *See Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

3. When Daily heard Wardlow make this statement, he immediately pulled over and transcribed Wardlow's words.

Judge Souter was alerted to this problem, and he called the parties into court the next day—Tuesday, September 16th—to formally ascertain Wardlow's position on Rule 45. At this hearing, Wardlow told Judge Souter that he wished to repudiate his earlier waiver. The judge immediately scheduled Wardlow's trial for the following day—September 17th.

Wardlow responded by moving to dismiss the case based on an asserted violation of Rule 45. Judge Souter (and, later, Superior Court Judge Eric T. Sanders) denied Wardlow's motion.

On appeal, the parties have focused much of their attention on Wardlow's written waiver of Rule 45.

The State argues that, once Wardlow filed his written waiver, Judge Souter was entitled to rely on that waiver until Wardlow affirmatively indicated that he had changed his mind. The State further argues that, even though Wardlow withdrew his waiver a few hours after it was filed, Wardlow's change of heart did not vacate the waiver *ab initio*. Rather, as this court held in *State v. Jeske* [4], the waiver was effective until Judge Souter affirmatively ascertained that Wardlow was no longer willing to waive his rights under Rule 45. That happened on September 16th. Wardlow's trial began the next day. Thus, the State reasons, Wardlow was brought to trial within the time limits of Rule 45.

Wardlow takes a different view of matters. According to Wardlow, the waiver that he executed on September 15th was prospective only. That is, Wardlow claims that he never intended to waive the Rule 45 violation that had already occurred. (Rule 45 was initially to have expired on September 8th.) Rather, Wardlow asserts, he was only willing to waive the seven days from the signing of the waiver document (September 15th) until the

scheduled trial date of September 22nd. Wardlow insists that, even when he signed the written waiver on September 15th, he nevertheless reserved his right to seek dismissal of his case because he was not tried on or before September 8th.

This is a dubious interpretation of events. As explained above, Wardlow's attorney promised Judge Souter that Wardlow would waive all of the time from September 8th until the newly-scheduled trial date of September 22nd. And the defense attorney's later actions indicate that she viewed the document as a waiver of all the intervening time. She not only filed a motion to withdraw the document, but she even tried to physically remove the document from the court file. One would not expect the defense attorney to take these actions if she thought that, even after the written waiver was filed, Wardlow still had the right to claim that Rule 45 had expired on September 8th.

But we need not resolve this issue of fact. Even if Wardlow had never executed the written waiver, Rule 45 was waived when Wardlow's attorney joined in the prosecutor's motion to set Wardlow's trial for September 22nd. As explained above, the defense attorney knew that Rule 45 was to expire on September 8th, she knew that Judge Souter would not return to work until after that date, and she wanted to hold Wardlow's trial at a time when Judge Souter would be able to preside. When Wardlow's attorney consented to a trial date of September 22nd, knowing that it fell outside the Rule 45 expiration date, she waived Wardlow's right to challenge that trial date.[5] This is true even though Wardlow was not physically present or even consulted when his attorney agreed to the September 22nd date.[6]

---

**4.** 823 P.2d 6 (Alaska App.1991).

**5.** *See DeMille v. State*, 581 P.2d 675, 677 (Alaska 1978).

**6.** *See Westdahl v. State*, 592 P.2d 1214, 1217–18 (Alaska 1979) (At the defendant's arraignment, the defense attorney agreed to a trial date beyond the time limits of Rule 45. Even though the defendant was not personally present at the arraignment, the supreme court held that, if the attorney understood that the proposed trial date

violated Rule 45, the attorney's agreement to that date constituted a waiver of the defendant's right to object to the trial date under Rule 45.); *Snyder v. State*, 524 P.2d 661, 664 (Alaska 1974) ("[We reject] Snyder's contention ... that the waiver of [Rule 45] was not legally effective since it was entered by counsel in his absence. ... We are of the view that our decisions [requiring the personal] waiver of fundamental constitutional rights are inapplicable ... to the Criminal Rule 45(d)(1) excluded period issue raised herein.").

■ Wardlow points out that Judge Souter stated that he did not intend to grant the motion to continue Wardlow's trial unless he received a written Rule 45 waiver from Wardlow. Based on Judge Souter's statement, Wardlow argues that the judge intended to abrogate the normal rule of waiver established by the supreme court in *DeMille* and *Westdahl*—that, despite *DeMille* and *Westdahl*, Judge Souter decided to insist that Wardlow provide written ratification of his attorney's action. Wardlow contends that he should have been allowed to call Judge Souter as a witness so that the judge could verify Wardlow's interpretation of the judge's pretrial ruling.

We note that, when the Rule 45 issue was litigated in the superior court, Wardlow never asked to have Judge Souter testify. Moreover, we believe that Judge Souter's remarks indicate only a healthy caution based on his years of experience in the criminal justice system. It is doubtful that Judge Souter really meant that he would refuse to extend the September 8th Rule 45 expiration date until he received a written waiver from Wardlow. Such a ruling would effectively give Wardlow the unilateral power to dismiss the prosecution (by refusing to execute the waiver until after September 8th).

■ But in any event, the defense attorney's knowing acquiescence in the September 22nd trial date constituted a waiver of Wardlow's Rule 45 rights regardless of Judge Souter's subjective intention. Both we and the supreme court have repeatedly stressed that Rule 45 must be interpreted based on an objective appraisal of events rather than the subjective interpretations or expectations of the parties.[7] We again reaffirm this view of the rule. Even if Judge Souter had wished to, he could not abrogate the interpretation of Rule 45 adopted by the supreme court in *DeMille* and *Westdahl.* Once Wardlow's at-

torney agreed to the September 22nd trial date (knowing that Rule 45 would otherwise expire before then), the waiver of Rule 45 was complete.

■ Because Wardlow appeared in court on September 16th and repudiated the waiver, he might argue that the Rule 45 clock started ticking again the next day, September 17th.[8] On the other hand, our decisions in *Sundberg v. State*[9] and *Petersen v. State*[10] indicate that Judge Souter would have been justified in adding several days to the Rule 45 calculation in order to work Wardlow's case back into the trial calendar—or in telling Wardlow that he would have to wait until the scheduled trial date of September 22nd.

But we need not speculate about these matters. When Wardlow repudiated the waiver, Judge Souter responded by setting Wardlow's trial for the very next day. Wardlow was therefore brought to trial within the time limits of Rule 45, and the superior court properly denied his motion to dismiss the charges.

*Judge Souter's decision to allow the State to introduce evidence of Wardlow's prior assault on another woman*

Before Wardlow's trial began, the prosecutor requested permission to introduce the testimony of three women who claimed to have been sexually assaulted by Wardlow. Judge Souter held a series of hearings at which the testimony of these three alleged victims was previewed.

Wardlow's niece, G.E., testified that, nine years before, Wardlow pushed her to the floor and had intercourse with her. Judge Souter excluded this testimony because he found that there was no clear evidence as to whether this act of intercourse had been nonconsensual, and also because he was con-

---

7. *See, e.g., Deacon v. State,* 575 P.2d 1225, 1228–29 (Alaska 1978); *Snyder v. State,* 524 P.2d 661, 663–64 (Alaska 1974); *State v. Clouatre,* 516 P.2d 1189, 1191 (Alaska 1973); *State v. Angaiak,* 847 P.2d 1068, 1072–73 (Alaska App.1993); *Russell v. Anchorage,* 626 P.2d 586, 589 (Alaska App. 1981).

8. *See Nickels v. State,* 545 P.2d 163, 165 (Alaska 1976) (when an event occurs that starts or re-

starts the running of Rule 45, the calculation begins from the day *after* that event).

9. 657 P.2d 843 (Alaska App.1982), *as modified on rehearing,* 667 P.2d 1268, 1270 (Alaska App. 1983).

10. 838 P.2d 812, 815 (Alaska App.1992).

cerned that evidence of incest would create an undue risk of unfair prejudice.

A second woman, R.L., was a prostitute; she testified that she accepted a ride from Wardlow on Friday evening, September 16, 1995—the night before Wardlow's attack on S.M. in the present case. R.L. testified that, as they neared their destination, Wardlow pulled his truck to the side of the road, then grabbed R.L. and threatened to cut her throat if she screamed. Believing that Wardlow was about to rape her, R.L. ran from the truck. Judge Souter excluded this testimony because R.L. was unable to identify Wardlow in court.

The State's third witness, P.P., testified that she had been picked up by Wardlow in the spring of 1993 (two and a half years before the events in the present case). P.P. was living on the street at this time. Wardlow asked if P.P. wanted a "date", but she declined and said that she just wanted a ride. They drove to the Northway Mall. Wardlow parked his vehicle, and P.P. used some crack cocaine. Wardlow then asked P.P. if she would have sex with him. When P.P. asked for money, Wardlow declared that he was "going to take it".

Wardlow pushed P.P. down into the seat and told her to take her clothes off. She removed one leg of her pants. Wardlow attempted to have sex with her, but he was unable to achieve an erection. At one point, P.P. tried to draw attention to the vehicle by hitting the horn. Wardlow grabbed her and started to choke her. He then threatened P.P. in words that echoed his threat to S.M. in the present case. Wardlow told P.P. that "if [she] tried to do anything like that again, he was going to ... kill [her] and take [her] out in the woods [where] no one would ever find [her] again."

Hearing this threat, P.P. "freaked out" and managed to escape from the vehicle. She called the police, but she did not report the incident as an attempted rape until more than two years later, when she saw the newspaper report of Wardlow's rape of S.M.

Judge Souter ruled that, under Evidence Rule 404(b)(3), the State would be permitted to introduce P.P.'s testimony if Wardlow raised a defense of consent.[11] As explained above, Wardlow did in fact testify that his sexual activity with S.M. had been consensual. The State was therefore allowed to introduce P.P.'s testimony.

Wardlow's attorney argued that, even if P.P.'s testimony was admissible under Rule 404(b)(3), this evidence still should be excluded under Evidence Rule 403 because its probative value was outweighed by its potential for unfair prejudice.[12] But Judge Souter ruled that Evidence Rule 403 did not apply to evidence admitted under Rule 404(b)(3). The judge based his ruling on the fact that the legislature had enacted Rule 404(b)(3) expressly to authorize evidence of a defendant's prior sexual assaults. Under former law, such evidence would generally have been excluded as unfair "propensity" evidence. But now, Judge Souter reasoned, the legislature had changed the law to allow the introduction of this evidence to prove the defendant's propensity to commit sexual assaults—the very purpose that would have been declared unfairly prejudicial under prior law. From this, the judge concluded that the legislature did not want trial judges to engage in Rule 403 balancing when the State offered this kind of evidence.

*Judge Souter's ruling that P.P.'s testimony was admissible under Evidence Rule 404(b)(3)*

Wardlow argues that P.P.'s testimony was not admissible under Evidence Rule 404(b)(3). On its face, Rule 404(b)(3) authorizes the admission of evidence of a defendant's other sexual assaults and attempted sexual assaults whenever a defendant is charged with sexual assault and raises a defense of consent. In contrast, Rule 404(b)(3)'s sibling provision, Rule 404(b)(1),

---

11. Evidence Rule 404(b)(3) states that, in prosecutions for sexual assault, "evidence of other sexual assaults or attempted sexual assaults [committed] by the defendant ... is admissible if the defendant relies on a defense of consent."

12. Evidence Rule 403 states, in pertinent part, that "[relevant] evidence may be excluded if its probative value is outweighed by the danger of unfair prejudice".

bars evidence of other crimes if the evidence is being offered to prove "propensity"—that is, "if the sole purpose for offering the evidence is to prove the character of the person in order to show that the person acted in conformity [with that character during the episode being litigated]". But Wardlow contends that Rule 404(b)(3) implicitly incorporates this same ban on "propensity" evidence. He further contends that P.P.'s testimony was offered for this forbidden purpose—to prove that Wardlow was a man who characteristically committed sexual assaults on women. Wardlow thus concludes that the State should not have been allowed to introduce P.P.'s testimony.

■ Wardlow is wrong: Evidence Rule 404(b)(3) does not incorporate the same ban on propensity evidence as Rule 404(b)(1). Section (b)(3) of Evidence Rule 404 was enacted by the legislature in direct response to decisions of this court that limited the State's ability to introduce evidence of a defendant's prior sexual crimes when, in a prosecution for sexual assault or attempted sexual assault, the defendant asserted that the sexual activity was consensual.[13] In particular, the legislature was reacting to this court's construction of Evidence Rule 404(b)(1)—our decision that Rule 404(b)(1) barred the State from introducing evidence of a defendant's other sexual assaults if that evidence was offered solely to prove the defendant's proclivity to sexually assault women.[14]

> In response to *Velez* and similar decisions construing the language of current Rule 404(b)(1), the legislature amended Evidence Rule 404(b) by adding subsections (b)(2) and (b)(3). These provisions authorize the introduction of evidence concerning the defendant's other wrongful acts

even though that evidence would otherwise be barred by Rule 404(b)(1).

*Clark v. State,* 953 P.2d 159, 163 (Alaska App.1998).

■ In other words, the legislature specifically intended to authorize the admission of evidence which, under former law, would have been excluded because it proved only the defendant's "propensity" to engage in sexual assault.[15] Even assuming that P.P.'s testimony could be characterized as purely "propensity" evidence—that is, even if her testimony was relevant only to show that Wardlow is a man who characteristically engages in sexual assaults on women, Rule 404(b)(3) nonetheless declares that this testimony is admissible.

*Judge Souter's ruling that any evidence admissible under Evidence Rule 404(b)(3) can not be excluded under Evidence Rule 403*

■ Although we reject Wardlow's interpretation of Evidence Rule 404(b)(3), we agree with him that Evidence Rule 403 continues to apply to this type of evidence. Even when evidence of a defendant's other crimes is admissible under 404(b)(3), a trial judge is still obliged to weigh the probative value of this evidence against its potential for unfair prejudice—and to exclude the evidence if the preponderant effect is unfair prejudice. In the legislative commentary to the sibling provision, Rule 404(b)(2), the legislature expressly stated that it wanted trial judges to apply the Rule 403 balancing test when the State proposes to introduce evidence of a defendant's other acts of sexual abuse of minors:

> The intent of the legislature is that, if the court finds that such prior bad acts are

---

**13.** *See* SLA 1994, ch. 116, § 1 ("Findings and Purpose"): "[I]n sexual assault and attempted sexual assault cases in which the defendant claims that the victim voluntarily 'consented' to the sexual activity, further amendment [of Evidence Rule 404(b)] is necessary to permit the prosecution to rebut this claim by introducing evidence of other sexual assaults or attempted sexual assaults by the defendant."

**14.** *See Velez v. State,* 762 P.2d 1297, 1304 (Alaska App.1988) ("[T]he state cannot offer evidence that [the defendant] ... had a disposition to

force his affections on unwilling women, and then [ask the trier of fact to] infer from that disposition that [the defendant] forced his affections on [the victim in the present case]. Despite its relevance, this evidence is absolutely precluded [by Evidence Rule 404(b)(1)].").

**15.** *See Smithart v. State,* 946 P.2d 1264, 1270 (Alaska App.1997), *reversed on other grounds,* 988 P.2d 583 (Alaska 1999), construing the sibling provision, Evidence Rule 404(b)(2).

relevant to a disputed fact at trial ..., the court must still balance the probative impact against the prejudicial effect of the evidence pursuant to Evidence Rule 403. 1988 House Journal 2332. We recently affirmed this legislative intent in *State v. Bingaman*, where we declared that Rule 403 applies to evidence that is admissible under Rule 404(b)(2)—(4).[16] Judge Souter was therefore mistaken when he declared that he was powerless to exclude evidence under Rule 403 once he found that this evidence was admissible under Rule 404(b)(3).

■ However, Judge Souter was right in one aspect of his analysis. When evidence of other sexual assaults and attempted sexual assaults is admissible under Rule 404(b)(3), and when the probative value of this evidence is weighed against its potential for unfair prejudice, the trial judge's assessment of "unfair prejudice" no longer includes the fact that the evidence tends to prove the defendant's propensity to engage in sexual assault. As Judge Souter correctly recognized, the legislature enacted Rule 404(b)(3) precisely because it wanted evidence of other assaults to be admissible to prove a defendant's assaultive propensity. This legislative purpose would be defeated if Rule 403 were interpreted to make the other crimes evidence "unfairly prejudicial" just because the evidence was relevant in the way the legislature intended.

Although the "propensity" aspect of other crimes evidence does not make it unfairly prejudicial, a Rule 403 balancing may still result in exclusion of the evidence. Indeed, Judge Souter himself apparently engaged in an instance of this balancing when he prohibited the State from introducing evidence relating to Wardlow's purported sexual assault on his niece, G.E. As noted above, Judge Souter excluded this evidence for two reasons. First, the judge was not convinced that the sexual activity between Wardlow and G.E. was non-consensual. Of course, if

the sexual activity was consensual, then this evidence would not be admissible under Rule 404(b)(3) because the incident would not qualify as a sexual assault or attempted sexual assault.

But Judge Souter also gave a second reason for excluding the evidence: even assuming that Wardlow had assaulted his niece, the jury's consideration of Wardlow's case was likely to be unfairly prejudiced if the jurors heard evidence of an incestuous assault. This was a plausible factor to be considered under Rule 403. Even though evidence of Wardlow's assault on his niece might have been relevant to prove his propensity to engage in sexual assault (a propensity that the legislature has now declared to be relevant), the evidence also tended to prove incest—a circumstance that might lead the jury to decide the case based on antagonistic emotion or other improper factors.[17] Pursuant to Rule 403, Judge Souter might have excluded the testimony on this basis or, alternatively, he might have limited the testimony by preventing any reference to the fact that G.E. was Wardlow's niece.

■ But P.P.'s testimony had no similar irrelevant and prejudicial aspect to it. Indeed, Wardlow's assault on P.P. was analogous in several key respects to Wardlow's assault on S.M. Both assaults occurred when Wardlow invited women to enter his vehicle. In both instances, Wardlow choked or attempted to choke his victims. And in both instances, Wardlow told his victims that he would take them out to the woods where no one could find them. These shared characteristics indicate that Wardlow's assault on P.P. might have had a case-specific relevance that would make it admissible even under Evidence Rule 404(b)(1).[18] In any event, they do not detract from the admissibility of the evidence under Rule 404(b)(3).

**16.** 991 P.2d 227, 230 (Alaska App.1999).

**17.** *See* Commentary to Evidence Rule 403, fifth paragraph: " 'Unfair prejudice' [in this] context means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one."

**18.** *See Smithart*, 946 P.2d at 1271–73 (discussing the definition of "propensity", and contrasting evidence of other crimes that merely demonstrate a defendant's criminal character with crimes that share "case-specific similarities" with the crime being litigated).

On appeal, Wardlow asserts that the evidence of his assault on P.P. should have been excluded under Rule 403 because it was "inflammatory" and because it "unfairly ... tip[ped] the scales toward conviction". But behind this rhetoric, Wardlow's basic contention is that the legislature is constitutionally prohibited from authorizing the admission of other crimes evidence to prove "propensity"—*i.e.*, to prove a person's character when character is being offered as circumstantial evidence that the person acted true to character during the episode being litigated. We rejected this argument in *Allen v. State*[19], and we reaffirm that decision here.

### Summary of our decision on this question

Evidence Rule 404(b)(3) authorizes the admission of evidence of a defendant's other sexual assaults and attempted sexual assaults when, in a trial for sexual assault, the defendant raises a defense of consent. Evidence of these other assaults is admissible to prove a defendant's propensity to sexually assault women; that is, the evidence is admissible under Rule 404(b)(3) even though it would be excluded under Rule 404(b)(1).

When evidence of other assaults is admissible under Rule 404(b)(3), a trial judge must still consider whether the evidence should be excluded or limited pursuant to Evidence Rule 403. Although the tendency of the evidence to prove the defendant's propensity to commit sexual assaults can no longer be deemed "unfair prejudice", other aspects of the evidence can be unfairly prejudicial (or can be cumulative, misleading, or confusing).

In Wardlow's case, Judge Souter committed error when he refused to consider whether P.P.'s testimony should be excluded under Rule 403. However, P.P.'s testimony was obviously relevant; this evidence tended to show that Wardlow had a propensity to sexually assault women. Further, Wardlow has failed to identify any aspect of P.P.'s testimony that was "unfairly prejudicial" in the sense of tending to deflect the jury from proper consideration of the case. Instead,

Wardlow argues that he was unfairly prejudiced precisely because P.P.'s testimony was probative in the way that the legislature intended. This is not "unfair prejudice" under Evidence Rule 403. Thus, even though Judge Souter committed error when he failed to assess P.P.'s testimony under Rule 403, that error was harmless.[20]

*The admissibility of Wardlow's volunteered statement to Officer Daily while Wardlow was being transported to the police station*

As explained above, S.M. escaped from Wardlow's camper when Wardlow stopped for a red light. She approached Officer Glen Daily and told him that the man driving the camper had raped her. Daily pursued Wardlow and, a few minutes later, he performed a traffic stop of Wardlow's vehicle. When Daily ran Wardlow's name through the police computer, he discovered that there was an outstanding felony warrant for Wardlow's arrest. Daily arrested Wardlow on this warrant and placed him in the patrol car.

While Wardlow was sitting in the patrol car, he asked to be taken to jail so that he could contact an attorney and then go to bed. Officer Daily had a cellular phone with him— a personal phone that he paid for himself. The officer did not offer to let Wardlow use this phone to call an attorney. Instead, he began driving Wardlow to a police station.

While they were en route, Wardlow asked where he was being taken. Daily replied that he was taking Wardlow to the police station at Tudor Road and Bragaw Street. Wardlow then declared, "About all they can do for me at Tudor and fucking Bragaw is lick the shit off my dick."

On appeal, Wardlow argues that, once he expressed the desire to speak with an attorney, Officer Daily was obliged to offer Wardlow the use of his cellular phone and to let Wardlow make the telephone call before he transported him to the police station. Wardlow relies on AS 12.25.150(b), which states

---

19. 945 P.2d 1233, 1237–38 (Alaska App.1997).

20. *See Silvernail v. State*, 777 P.2d 1169, 1174–78 (Alaska App.1989) (when the trial court failed to perform the required analysis under Evidence Rule 403, this court weighed the evidence and determined whether it should have been admitted or excluded).

that "[i]mmediately after [being arrested], a prisoner shall have the right to telephone or otherwise communicate with the prisoner's attorney and any relative or friend".

Wardlow contends that, when the statute speaks of "immediate" telephone calls, this means that an arresting officer must allow a suspect to make the calls from the field, before the suspect is transported to a police station or other place of detention, if a telephone is available. Thus, Wardlow argues, when Officer Daily failed to offer Wardlow the use of his cellular phone, the officer violated Wardlow's statutory right to make an "immediate" phone call. Wardlow further contends that his ensuing statement (concerning the services available at the police station) was the unlawful fruit of Daily's decision not to offer his cellular phone to Wardlow.

■ AS 12.25.150(b) guarantees an arrestee the right to make at least two telephone calls immediately following their arrest—one to an attorney, another to a relative or friend.[21] Two major decisions of the Alaska Supreme Court have defined what constitutes an "immediate" phone call. In *Zsupnik v. State*[22], the court ruled that when an arrested motorist is brought to a police station for a breath test, the motorist is ordinarily entitled to place the phone calls before the police administer the breath test. And in *Smith v. State*[23], the court ruled that an arrestee who is brought to a police station before being taken to jail is entitled to make these phone calls from the police station—that the police have no authority to make the arrestee to wait until they arrive at the jail.

But *Zsupnik* and *Smith* do not resolve the issue Wardlow raises. Both *Zsupnik* and *Smith* involved arrestees who were at a police station when they requested their phone calls. Wardlow asserts that the statutory right to communicate with an attorney arises

as soon as the police take physical custody of an arrestee—that if the arrestee asks for a telephone call, and if some type of telecommunications equipment is available at the scene of the arrest, the police must immediately honor the arrestee's request.

■ It is not clear that Wardlow's case actually raises this issue. As explained above, Wardlow did not expressly ask to make an immediate phone call to his attorney. Rather, it appears that he asked to be allowed to call his attorney as soon as he arrived at the jail. If that is what Wardlow asked for, *Zsupnik* and *Smith* already provide the answer to Wardlow's case: the police were obliged to honor Wardlow's request. But even assuming that Wardlow expressed a desire to immediately communicate with his attorney, we conclude that Officer Daily could lawfully delay this phone call until he and Wardlow arrived at the police station.

Wardlow's argument poses a question of statutory interpretation—one that is made more difficult because the provision granting arrestees the right to "telephone or otherwise communicate" with attorneys, relatives, and friends was enacted in 1957, long before the advent of our current mobile communications technology.[24] When our legislature decreed forty years ago that arrestees should have the right to "immediately" communicate with their attorneys, the legislature was not thinking of police officers carrying cellular telephones or laptop computers capable of sending wireless faxes and e-mail.

■ But upon reflection, we believe that the availability of new portable communications technology does not affect the working of the statute. Instead, we conclude that an arrestee's statutory right to "immediate" communication with attorneys, relatives, and friends normally does not attach until the

---

21. See *Zsupnik v. State*, 789 P.2d 357, 359–360 (Alaska 1990).

22. 789 P.2d at 359–361.

23. 948 P.2d 473, 476 n. 3 (Alaska 1997).

24. Our current statute, AS 12.25.150(b), was enacted in 1962 by the first state legislature. *See* SLA 1962, ch. 34, § 2.16. But the pertinent

language of AS 12.25.150(b) was drawn from a territorial statute, ACLA § 66–5–34, that was enacted in 1957. *See* Laws 1957, ch. 128, § 1. This earlier statute read: "Immediately after an arrest, any prisoner shall have the immediate right to forthwith telephone or otherwise communicate with his attorney or any relative or friend[.]"

arrestee is brought to a place of detention such as a police station or a jail.

The supreme court's decisions in *Zsupnik* and *Smith* stress an arrestee's right to immediate communication. But both of those cases involved suspects who had already been brought to a place of detention (a police station), and the question was whether the police could make the suspects wait for their phone calls until the police delivered them to jail. We believe that different policies govern situations in which the officer and the arrestee (or arrestees) are still in the field.

Until a police officer brings an arrestee to a place of detention, the situation remains volatile. An arrestee may be motivated to try to escape, destroy evidence, or even attack the officer. The officer is often in sole charge of the arrestee. Because of these circumstances, we do not interpret AS 12.25.150(b) to require an arresting officer to stop on the way to the police station so that an arrestee can use a pay phone. Any rule that obliged an arresting officer to let the arrestee leave the patrol car and use a telephone in a public place would entail an unjustified to risk to the officer and to other members of a public.

For similar reasons, we believe that the legislature did not intend to require arresting officers to relinquish portable communication devices to an arrestee while the officer and the arrestee are still in the field. An officer may need a cellular telephone (or other portable device) to summon aid or to otherwise communicate with fellow officers. The cellular telephone would be unavailable to the officer while it was in the possession of the arrestee, and it is conceivable that the arrestee might not willingly return the phone to the officer.

It is, of course, possible to argue that the circumstances of arrests will vary considerably from case the case, and there will be times when handing a cellular phone to an arrestee will pose no significant danger to anyone. We could interpret the statute to require that each case be analyzed on its own facts: the seriousness of the charge for which the person was arrested, the arrestee's level of intoxication and/or aggressiveness, the arrestee's past history of crime, violence, and resistance to the police, the relative number of officers and arrestees, the time of day, and other similar considerations. But such a rule would inevitably lead to uncertainty and litigation. Officers in the field, faced with an arrestee's request for a telephone call, would have to quickly assess all these factors. The factors might often point toward differing conclusions, and a wrong decision might mean suppression of a considerable amount of evidence.

Moreover, a rule of case-by-case analysis would not achieve significant benefits to arrestees. The interval between an arrest and the arrestee's arrival at a police station or jail is generally short. Further, any interrogation during this interval must be preceded by *Miranda* warnings, or the arrestee's answers will be suppressed.

■ When we weigh these competing considerations, we conclude that the purposes of the statute and the presumed intent of the legislature are served better by a rule that defines a particular event—the arrestee's arrival at a place of detention—as the event that triggers the arrestee's right to make a phone call. We wish to make it clear, however, that we will not allow the police to use this rule as a ploy for denying arrestees their right to make phone calls. If a defendant asks to telephone an attorney, a friend, or a relative after they are taken into custody, and if the defendant proves that the police unreasonably delayed bringing the defendant to a place of detention, this will establish a violation of the defendant's rights under AS 12.25.150(b).

Applying this construction of the statute to Wardlow's case, we conclude that Officer Daily did not violate Wardlow's rights under AS 12.25.150(b) when he refrained from offering his cellular phone to Wardlow. Daily could lawfully require Wardlow to wait until they arrived at the police station. The superior court therefore properly denied Wardlow's motion to suppress the statement he made while riding in the patrol car.

■ The superior court's decision is also supportable on an alternative basis. Even assuming that Officer Daily was obliged to offer his cellular phone to Wardlow so that

Wardlow might immediately telephone an attorney, his failure to do so did not taint Wardlow's ensuing statement about what the officers might do for him at the Tudor and Bragaw police station. Wardlow's statement was not the product of interrogation; rather, it was a volunteered statement that did not respond to or flow from anything previously said between Wardlow and the officer. As explained above, Wardlow initiated the conversation by asking Daily where he was being taken. Daily answered this neutral question by informing Wardlow that he was taking him to the police station at Tudor and Bragaw—whereupon Wardlow made his incriminatory statement.

The United States Supreme Court has repeatedly held that even after a defendant is formally charged with a crime and the defendant's Sixth Amendment right to counsel has attached, this constitutional right to counsel is not violated when police officers listen to and report a defendant's volunteered statements. Rather, the right to counsel is violated only when the police (or their agents) interrogate the defendant:

> [T]he Sixth Amendment is not violated whenever—by luck or happenstance—the State obtains incriminating statements from the accused after the right to counsel has attached. ... [A] defendant does not make out a violation of that right simply by showing that an informant, either through prior arrangement or voluntarily, reported his incriminating statements to the police. Rather, the defendant must demonstrate that the police and their informant took some action, beyond merely listening, that was designed deliberately to elicit incriminating remarks.

*Kuhlmann v. Wilson*, 477 U.S. 436, 458–59, 106 S.Ct. 2616, 2629–630, 91 L.Ed.2d 364 (1986). As the Supreme Court stated in *Brewer v. Williams*, the protection of the Sixth Amendment "[does not] come into play if there [is] no interrogation".[25]

We conclude that the same rule applies when the police violate a suspect's statutory right to contact counsel under AS 12.25.150(b). Thus, even if Officer Daily had violated this statute when he refrained from offering Wardlow the use of his cellular telephone, this would not require suppression of Wardlow's statement because this statement was not the product of interrogation.

For all of these reasons, we conclude that Wardlow's statement to Officer Daily was admissible against Wardlow at his trial.

*The amendment of the verdicts to reflect the jury's decision*

Wardlow was tried on several counts. Count I charged him with kidnapping S.M., and Counts II through IV charged Wardlow with engaging in different types of non-consensual sexual penetration of S.M. Count II charged vaginal penetration, Count III charged anal penetration, and Count IV charged fellatio.

Late in the afternoon of October 3, 1997, Wardlow's jury returned its verdicts. Judge Souter read these verdicts aloud:

> *The Court*: Verdict One: "We, the jury, find the defendant ... guilty of kidnapping as charged in Count I of the indictment...."

> Verdict Two: "We, the jury, find the defendant ... not guilty of sexual assault in the first degree as charged in Count II of the indictment...."

> Verdict Three: "We, the jury, find the defendant ... guilty of sexual assault in the first degree as charged in Count III of the indictment...."

> Verdict Four: "We, the jury, find the defendant ... guilty of sexual assault in the first degree as charged in Count IV of the indictment...."

After reading these verdicts, Judge Souter polled the jurors with respect to each verdict. Count by count, the judge first asked the jurors to raise their hands if they concurred in the verdict, and then he asked the jurors to raise their hands if they disagreed with the verdict. All twelve jurors indicated their

---

25. 430 U.S. 387, 400, 97 S.Ct. 1232, 1240, 51 L.Ed.2d 424 (1977). *Accord, United States v. Hearst*, 563 F.2d 1331, 1347–48 (9th Cir.1977); *State v. William*, 248 Kan. 389, 807 P.2d 1292, 1310 (1991); *People v. Williams*, 44 Cal.3d 1127, 245 Cal.Rptr. 635, 643–44, 751 P.2d 901, 909–910 (1988); *State v. Adkins*, 80 Ohio App.3d 211, 608 N.E.2d 1152, 1158 (1992).

assent to the verdicts as read. Judge Souter accepted the verdicts, then thanked the jurors for their service and excused them.

Eleven of the twelve jurors immediately returned to the jury room to collect their belongings. (The twelfth juror stayed behind in the courtroom to discuss the forensic evidence with the prosecutor.) Judge Souter went into the jury room and made himself available for questions. During the ensuing discussion, the judge was asked to explain the possible sentence that Wardlow faced for the various convictions. As the judge was explaining the counts and the sentencing ranges, the jury forewoman spoke up and said that she feared that there might have been a mistake in the verdicts.

The forewoman told Judge Souter that the jury had found Wardlow guilty of Count II (vaginal penetration) and not guilty of Count IV (fellatio). But Judge Souter had announced these verdicts the other way around: "not guilty" with respect to Count II, and "guilty" with respect to Count IV. Hearing this, Judge Souter immediately called the jurors and the parties back into the courtroom, and he went back on the record. This was no more than two minutes after the jury had been excused.

The judge summarized for the parties what had occurred in the jury room, and he declared that he had not asked the jurors any questions concerning how they had reached their verdicts. Judge Souter then clarified that the theory of prosecution underlying Count II was vaginal penetration, and that the theory underlying Court IV was fellatio. He asked the jurors whether they found Wardlow guilty or not guilty of Count II; they replied "guilty". He polled the jury, and all twelve jurors raised their hands to affirm that they had found Wardlow guilty on that count. The judge then repeated this process for Count IV. The jurors announced that they had found Wardlow "not guilty" on that count.

Having questioned the jurors on these matters, and having received their unanimous responses, the judge again excused the jurors. Twenty minutes had elapsed since the jurors were first excused. Judge Souter subsequently entered judgement against Wardlow in accordance with what the jurors had told him: "guilty" on Count II and "not guilty" on Count IV.

■ On appeal, Wardlow argues that Judge Souter violated the constitutional guarantee against double jeopardy when he allowed the jurors to revise their announced verdict on Count II to reflect a verdict of "guilty". (Wardlow does not challenge the judge's decision to amend the verdict on Count IV to "not guilty".)

Wardlow's contention is governed by our decision in *Davidson v. State*.[26] In *Davidson*, we held that a trial judge is authorized to ask jurors to clarify their verdict "when it appears that the written verdict may not accurately convey their group decision".[27] Just as in *Davidson*, Judge Souter "did not ask [Wardlow's] jurors to justify their verdict or to explain how they arrived at their decision. Rather, he asked the jurors to clarify what their decision had been."[28] Having resolved the confusion, Judge Souter was authorized to amend the verdicts so that they accurately reflected the jurors' decision. This procedure did not violate the double jeopardy clause.[29]

### Wardlow's attack on his sentence

Wardlow was convicted of kidnapping and two counts of first-degree sexual assault. He asserts that the composite sentence he received for these crimes is excessive. (Wardlow was also convicted of second-degree assault, but he does not challenge his sentence for this crime; this sentence was entirely concurrent with Wardlow's other sentences.)

Kidnapping is punishable by a sentence of between 5 and 99 years' imprisonment.[30]

---

**26.** 975 P.2d 67 (Alaska App.1999).

**27.** *Id.* at 73.

**28.** *Id.*

**29.** *See United States v. Stauffer*, 922 F.2d 508, 513 (9th Cir.1990); *United States v. Dotson*, 817 F.2d 1127 (5th Cir.1987), *vacated in part on rehearing*, 821 F.2d 1034 (1987).

**30.** *See* AS 12.55.125(b).

First-degree sexual assault is punishable by a sentence of between 0 and 30 years' imprisonment.[31] Because Wardlow was a third felony offender, he faced a presumptive term of 25 years' imprisonment on the two sexual assault counts.[32] (There are no presumptive terms for kidnapping.)

Judge Souter sentenced Wardlow to a total of 30 years' imprisonment for the two sexual assault convictions. For the kidnapping conviction, Judge Souter imposed a consecutive sentence of 30 years to serve (50 years with 20 years suspended). Thus, Wardlow's composite sentence is 60 years to serve.

In *Williams v. State* [33], this court reviewed and analyzed Alaska cases involving challenges to sentences imposed on defendants convicted of kidnapping and rape (first-degree sexual assault). Based on our analysis of these cases, we established benchmark sentencing ranges for defendants convicted of these offenses. For first felony offenders, a composite term of 20 years or less will normally be appropriate.[34] For defendants who have a prior felony conviction but whose criminal history is not extensive enough to qualify them as "dangerous offenders", the composite term normally should not exceed 30 years to serve—even when the rape involves significant violence or multiple acts of penetration.[35] Sentences exceeding 30 years to serve normally should be reserved for defendants who commit a kidnapping of prolonged duration or whose criminal history demonstrates that they are persistent, violent criminals.[36]

 Wardlow's sentence of 60 years to serve obviously lies at the upper end of the *Williams* benchmark ranges, and Wardlow contends that this sentence can not be justified under the *Williams* criteria. Wardlow argues that his case shares the characteristics of cases within the second *Williams*

benchmark range, and thus his sentence should not exceed 30 years to serve.

Wardlow points out that his kidnapping of S.M. was of relatively short duration. He acknowledges that he has several prior felonies, but he contends that these past offenses do not demonstrate the kind of persistent violence that might justify a sentence exceeding 30 years. However, Wardlow's argument overlooks several factors that make his case more serious than it might first appear.

It is true that Wardlow's prior convictions have mainly been for non-violent crimes. Among Wardlow's prior felonies, only his 1973 robbery conviction involved violence; and even in that case, the firearm used in the crime was unloaded. But Wardlow has been in intermittent trouble with the law for the past quarter century. His first offenses were committed in 1971, when he was 20 years old. He is now 46. In those twenty-six years, Wardlow has been convicted of five felonies (three burglaries, one robbery, and an arson), as well as approximately one dozen misdemeanors and serious driving offenses. A lengthy criminal record of this type is an appropriate sentencing consideration, even when the defendant's current offense is not particularly serious.[37]

But Judge Souter found that Wardlow's current offense was particularly serious, and the record supports this conclusion. As Judge Souter noted, Wardlow tied S.M. up and inflicted numerous injuries on her; most notably, he hit S.M. on the head with a hammer. Then, after Wardlow sexually assaulted S.M., he kept her tied up in the back of the camper and attempted to drive away with her. Based on Wardlow's statements to S.M., Judge Souter found that Wardlow intended to "hold [S.M.] indefinitely so that he could [sexually assault] her, however often and however long he wished, and then he was going to discard her by killing her."

31. *See* AS 12.55.125(i).

32. *See* AS 12.55.125(i)(4). Wardlow was convicted of burglary in 1971, a robbery and two more burglaries in 1973, and arson in 1987.

33. 800 P.2d 955 (Alaska App.1990), *modified on reconsideration*, 809 P.2d 931 (1991).

34. *Williams,* 800 P.2d at 959.

35. *Id.* at 959–960.

36. *Id.* at 960.

37. *See Larson v. State,* 613 P.2d 1251, 1252 (Alaska 1980).

Moreover, based on P.P.'s testimony, Judge Souter found that Wardlow had previously engaged in a similar attempt to kidnap and rape another woman. This incident occurred in the spring of 1993—about two and a half years before the events in the present case. In that prior case, as in the present case, Wardlow threatened to kill his victim.

Although Judge Souter recognized that Wardlow did not fit the definition of "dangerous offender" formulated by the American Bar Association and employed by this court in a number of cases [38], the judge found that Wardlow was a "dangerous offender" within the common meaning of that phrase, and he further found that Wardlow was a "worst offender" as that term has been defined in Alaska sentencing cases.[39]

Finally, and perhaps most significantly, Judge Souter recognized that Wardlow's case was different in one key respect from the kidnapping/rape cases summarized in *Williams*. *Williams* analyzed cases in which the defendant committed kidnapping as a prelude to a rape, or as a means of committing rape. In contrast, Wardlow's kidnapping of S.M. occurred *after* he sexually assaulted her.

Wardlow did not kidnap S.M. so that he could accomplish the sexual assaults charged in the indictment. Judge Souter concluded that Wardlow's motive for the kidnapping was completely separate—"a wholly different crime [from the charged sexual assaults], and a horrendous one at that". The judge found that Wardlow intended to hold S.M. "[as] a sex slave and then ... discard her like a piece of worn-out property when he was through with her"—by killing her.

Judge Souter's finding, which is amply supported by the record, makes Wardlow's case more analogous to *Morrell v. State* [40]

and *Post v. State* [41], cases in which the Alaska Supreme Court upheld sentences of life imprisonment for kidnapping and rape. As this court recognized in *Williams* [42], the offenses in *Morrell* and *Post* were significantly more serious than a typical kidnapping/rape because the defendants in those cases intended to hold their victims indefinitely and to repeatedly sexually assault them. Judge Souter found that Wardlow intended to do the same thing—and then to kill his victim. Wardlow's plan was thwarted only by the fortunate chance that S.M. managed to free herself and escape from Wardlow's camper while she was still in the middle of the city, where she could find help.

Having independently reviewed the record, we conclude that the facts of Wardlow's current offense, his lengthy criminal record, and his previous attempt to kidnap and rape another woman all support Judge Souter's conclusion that Wardlow's case is unusually aggravated and that Wardlow should receive a sentence significantly above the 20- and 30-year benchmark ranges announced in *Williams*. We find that Wardlow's composite sentence of 60 years to serve is not clearly mistaken.[43]

*Conclusion*

For the reasons explained here, we uphold Wardlow's convictions and his sentence. The judgement of the superior court is AFFIRMED.

---

**38.** *See, e.g., Williams v. State*, 759 P.2d 575, 577–78 (Alaska App.1988); *McCombs v. State*, 754 P.2d 1129, 1133 n. 1 (Alaska App.1988) (Singleton, J., concurring and dissenting); *Skrepich v. State*, 740 P.2d 950, 953–54 (Alaska App.1987).

**39.** *See, e.g., State v. Wortham*, 537 P.2d 1117, 1120 (Alaska 1975); *Napayonak v. State*, 793 P.2d 1059, 1062 (Alaska App.1990).

**40.** 575 P.2d 1200, 1202–03, 1213 (Alaska 1978).

**41.** 580 P.2d 304, 305–06, 309 (Alaska 1978).

**42.** 800 P.2d at 960.

**43.** *See McClain v. State*, 519 P.2d 811, 813–14 (Alaska 1974) (an appellate court is to affirm a sentencing decision unless the decision is clearly mistaken).