[No. A083712. First Dist., Div. Four. Jan. 21, 2000.]

THE PEOPLE, Plaintiff and Respondent, v.
ALPHONSO EDDIE ROUNDTREE, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts II. and III.

## COUNSEL

J. Frank McCabe, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Acting Chief Assistant Attorney General, Ronald A. Bass, Assistant Attorney General, Stan M. Helfman and Violet M. Lee, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**HANLON, P. J.**—Alphonso Eddie Roundtree (appellant) appeals from a judgment upon a jury verdict finding him guilty of rape (Pen. Code,[1] § 261, subd. (a)(2)); unlawful sexual intercourse (§ 261.5, subd. (d)); and lewd or lascivious act on a child under the age of 14 (§ 288, subd. (a)). In a bifurcated proceeding, the trial court found true the allegations that appellant suffered four prior prison terms within the meaning of section 667.5, subdivision (b) and that he was ineligible for probation (§ 1203, subd. (e)(4)). Appellant contends that the trial court erred in its instructions to the jury following an inquiry by the jury during deliberations. He also argues that his statement was admitted into evidence in violation of *Miranda*.[2] We affirm.

### FACTS

On May 28, 1997, Jennifer, who was 15 years old, was living at Daytop, a group home, in Redwood City. She ran away from Daytop about 5:30 or 6:00 p.m. that day after being subjected to a "haircut," a session in which she was criticized for her behavior during a group session.

---

[1] All further statutory references are to the Penal Code.
[2] *Miranda v. Arizona* (1966) 384 U.S. 436 [86 S.Ct. 1602, 16 L.Ed.2d 694, 10 A.L.R.3d 974].

Jennifer wandered around and eventually got a ride to East Palo Alto. Jennifer's mother was living in a residential program at Daytop Adult Services in East Palo Alto. Jennifer decided that she would try to find her mother. By this time, it was after midnight. She saw appellant on the street and asked him if he knew where Daytop Adult Services was located. Appellant said that he would take her there. Jennifer told him that she was 15 years old and that she had run away. Appellant told her that he was 39. As they walked and approached people on the street, appellant told her to pretend that she was his girlfriend and to tell people that she was 18 or 19 if anyone asked. Appellant assured her that he would not let anything happen to her.

They walked for two to three hours. Appellant told her that they were going to his house. They reached an apartment complex and walked into the carport area. Appellant told Jennifer that his sister lived in the complex but that they should wait in the car in the carport until his sister awoke. They got in the car and appellant told her to take a nap. Appellant suggested that she place her head on his chest. Jennifer did so and they fell asleep.

When Jennifer awakened, she needed to use the bathroom. She woke up appellant who went upstairs to an apartment a few times but returned and told Jennifer either that his sister was not up yet or that she could not go up because she was White. Jennifer then insisted that she wanted to go see her mother. Appellant became angry and started pulling off her clothes. Jennifer told him "no" but appellant told her to shut up and hit her in the face twice. He proceeded to rape Jennifer. Jennifer cried and told appellant to stop. After appellant ejaculated, Jennifer got dressed.

Violet McAllister, the girlfriend of appellant's stepbrother, came downstairs because she heard Jennifer. She told Jennifer to come upstairs. Jennifer told McAllister that appellant raped her. McAllister told her not to tell anyone. Jennifer took a shower and McAllister gave her new underwear, socks and a T-shirt to wear. McAllister told Jennifer to put bleach on anything she touched. McAllister threw away the underwear that Jennifer had been wearing.

Jennifer left the apartment with appellant in the morning. A woman picked them up and dropped them off on another street. Appellant obtained some crack cocaine and smoked it while Jennifer was nearby. They then went to a house, where appellant tried to kiss her and fondled her breasts. They left the house and continued walking. Jennifer recognized the road to Daytop Adult Services and walked towards the facility. She was crying and ran to her mother when she saw her on the front steps of the facility. She told her

mother that she was raped by a Black man named Eddie. They reported the incident to the police.

Detective Reich investigated the incident. Jennifer accompanied him to attempt to locate the apartment complex where the rape occurred. Jennifer and Reich located the apartment complex at 35 Newell Road and the car where she was raped. Jennifer also identified a man and a woman from apartment 204 as being the people she saw in the apartment that morning. Jennifer was taken to the San Mateo County General Hospital, where she was examined. Sperm was found in her vagina.

Based on Jennifer's description, the police located appellant. After being advised of his *Miranda* rights, appellant denied that he had any contact with a White girl on May 28 and May 29 and stated that he had not had sexual intercourse in the past six months.

Violet McAllister testified that she was living with appellant's step-brother, Richard Ward, at the Newell Road apartment on May 29. Appellant came to their apartment that morning about 6:30 or 7:00 a.m. Ward answered the door but did not let appellant in the apartment. McAllister became concerned that appellant might have been sleeping in her car so she went downstairs to investigate. Appellant was not in her car but she heard voices coming from a small car parked in the carport. McAllister saw appellant and Jennifer in the car. Jennifer appeared upset. McAllister took her up to her apartment. McAllister allowed Jennifer to use the bathroom and take a shower.

Linda French, a criminalist, testified that she found semen on Jennifer's panties. She also found semen on appellant's pants, shirt and T-shirt.

In defense, appellant testified that Jennifer consented to having sexual intercourse with him on May 29. He admitted that she told him to stop at one point because she thought she heard someone coming towards the car. Appellant said that Jennifer became angry at that point and that he got off of her. He admitted that he lied to the police about not having sexual intercourse on May 29.

DISCUSSION

I.

Appellant contends that the trial court erred when it instructed the jury in response to the jury's inquiry during deliberations. During the course

of deliberations, the jury sent the court a note stating, "If, after penetration, the female changes her mind and says 'stop' and the male continues, is this still rape." The court responded that "[u]nder these circumstances the intercourse can be rape if all of the elements of rape as defined in CALJIC 10.00 and 1.23.1 are present. [¶] To put it another way, if all of the elements of rape are present, the fact that there was a prior penetration with the consent of the female does not negate rape." The court then reread CALJIC Nos. 10.00 (definition of rape) and 1.23.1 (definition of consent) to the jury and gave CALJIC No. 10.65 (reasonable and good faith belief in consent) for the first time.[3] Appellant objected to the sentence of the court's instruction beginning, "To put it another way . . . ." Thirteen minutes after the court responded to the jury's inquiry, the jury reached its verdict.

Relying on *People v. Vela* (1985) 172 Cal.App.3d 237 [218 Cal.Rptr. 161], appellant argues that the court erred when it instructed the jury that "the fact that there was a prior penetration with the consent of the female does not negate rape." In *Vela*, during deliberations, the jury asked, " 'Once penetration has occurred with the female's consent, if the female changes her mind does force from that point (where she changes her mind) constitute rape.' " (*Vela, supra,* 172 Cal.App.3d at p. 239.) The court answered the question in the affirmative, but the court and attorneys subsequently researched the issue and determined that the response may have been incorrect. (*Id.* at p. 240.) In the meantime, however, the jury reached a verdict finding the defendant guilty of rape. The court then polled the jury and determined that two jurors based their verdict on the circumstances described in the note. (*Ibid.*) The court then advised the jury that it did not have a definitive answer to the jury's question and that it was not sure that it gave the jury the correct answer. (*Vela, supra,* at p. 240.) The court then reinstructed the jury on the crime of rape. After further deliberations, the jury again returned a guilty verdict. (*Ibid.*)

The *Vela* court, noting that the question posed by the jury was one of first impression in the state, relied on two cases from other jurisdictions, *Battle v. State* (1980) 287 Md. 675 [414 A.2d 1266] and *State v. Way* (1979) 297 N.C. 293 [254 S.E.2d 760], which held that if there was consent to sexual intercourse preceding penetration, the crime of rape was not committed if the consent was withdrawn following penetration. (*People v. Vela, supra,* 172 Cal.App.3d at pp. 241-242.) The *Vela* court held that the "presence or absence of consent at the moment of initial penetration [is] the crucial point in the crime of rape. . . . [I]f consent is given at the moment of penetration, that act of intercourse will be shielded from being a rape even if consent is later withdrawn during the act." (*Id.* at p. 242.) "[T]he essential guilt of

---

[3]The court had earlier rejected appellant's request for this instruction.

rape as stated in Penal Code section 263 is lacking in the withdrawn consent scenario." (*Id.* at p. 243.) The court noted that the defendant in that situation is guilty of an assault or battery. (*Ibid.*) The *Vela* court concluded that the trial court's response to the jury's inquiry was erroneous and that the error was prejudicial, requiring reversal. (*Id.* at pp. 243-244.)

The *Vela* court's conclusion is unsound. Section 261, subdivision (a)(2) defines rape as "an act of sexual intercourse accomplished with a person not the spouse of the perpetrator . . . . [¶] . . . [¶] . . . [w]here it is accomplished against a person's will by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the person . . . ." "The essential guilt of rape consists in the outrage to the person and feelings of the victim of the rape." (§ 263.) The crime of rape therefore is necessarily committed when a victim withdraws her consent during an act of sexual intercourse but is forced to complete the act. The statutory requirements of the offense are met as the act of sexual intercourse is forcibly accomplished against the victim's will. The outrage to the victim is complete. That the victim initially consented to the act is not determinative. In this respect, the *Vela* court's conclusion that an act of sexual intercourse that begins consensually cannot result in the same "sense of outrage to [the victim's] person and feelings" as that resulting from a nonconsensual penetration (172 Cal.App.3d at p. 243) is wrong. Indeed, several courts that have considered the question posed in *Vela* have criticized the decision and expressly disagreed with the conclusion that a rape is not committed when a victim withdraws her consent but is forced to continue with sexual intercourse against her will. (*State v. Crims* (Minn.Ct.App. 1995) 540 N.W.2d 860, 865; *State v. Jones* (S.D. 1994) 521 N.W.2d 662, 672; *State v. Siering* (1994) 35 Conn.App. 173 [644 A.2d 958, 963].)

In *State v. Robinson* (Me. 1985) 496 A.2d 1067, the court addressed the identical issue we face today. There, the jury also questioned whether initial consent to sexual intercourse forecloses a finding of rape. The court held that the trial court correctly instructed the jury that a rape is committed if the sexual intercourse is continued only as a result of compulsion. (*Id.* at p. 1070.) The court noted that "[t]he dramatic change from the role of a voluntary participant to that of a victim compelled involuntarily to submit to the sexual intercourse is a distinct one." (*Robinson, supra,* at p. 1071.) When a victim is forced to submit to continued intercourse for a period after she has revoked her original consent, the crime of rape is committed. (*Ibid.*)

The *Robinson* court states the better view. We therefore decline to follow *Vela.* The *Vela* court focussed on "the moment of penetration as the crucial moment of the crime of rape." (*People v. Vela, supra,* 172 Cal.App.3d at p.

242.) While it is true that any penetration, however slight, is sufficient to complete the crime of rape (§ 263), that was not the question presented in *Vela* nor is it the issue presented here. Although the *Vela* court acknowledged that rape is "nonconsensual sexual intercourse," citing *People v. Key* (1984) 153 Cal.App.3d 888, 895 [203 Cal.Rptr. 144]), it failed to apply the statutory language of section 261 to the factual scenario presented. Section 261, subdivision (a)(2) defines rape as sexual intercourse that *is* accomplished against a person's will. Under section 261, a rape is necessarily committed if a victim is forced to continue with sexual intercourse against her will. The court here correctly so instructed the jury.

In response to the jury's inquiry, the court instructed the jury on rape in the language of the statute as set forth in CALJIC No. 10.00. And, the court emphasized that all of the elements of rape had to be present in order to make a finding of rape. Under these circumstances, appellant cannot complain of error.

## II., III.*

. . . . . . . . . . . . . . . . . . . . . . . . . . .

## IV.

The judgment is affirmed.

Reardon, J., and Sepulveda, J., concurred.

Appellant's petition for review by the Supreme Court was denied May 10, 2000. Mosk, J., was of the opinion that the petition should be granted.

---

*See footnote, *ante,* page 846.