**Tracy J. McGILL, Appellant,**

v.

**STATE of Alaska, Appellee.**

**No. A–7218.**

Court of Appeals of Alaska.

Feb. 9, 2001.

---

**31.** *Robbins*, 528 U.S. at 278 n. 10, 120 S.Ct. at 760 n. 10.

**32.** *See* AS 12.72.020(a)(6).

Susan Downie, Assistant Public Defender, Fairbanks, and Barbara K. Brink, Public Defender, Anchorage, for Appellant.

Marcelle K. McDannel, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Bruce M. Botelho, Attorney General, Juneau, for Appellee.

Before COATS, Chief Judge, and MANNHEIMER and STEWART, Judges.

*OPINION*

STEWART, Judge.

A jury convicted Tracy J. McGill of first-degree sexual assault.[1] McGill argues that the superior court erroneously admitted evidence of his prior bad acts. McGill also contends that a jury instruction was faulty. We conclude that the superior court did not abuse its discretion by admitting the challenged evidence, or, at worst, committed harmless error. We further conclude that the instruction was not an abuse of discretion. Therefore, we affirm.

*Facts and proceedings*

On November 7, 1997, Priscilla Dayton called the Fairbanks police and reported that a woman was being sexually assaulted outside Dayton's apartment door. Fairbanks Police Officer Burlyn Rigdon responded to Dayton's apartment complex and found McGill and C.S. in the stairwell outside Dayton's apartment, apparently having sexual intercourse. McGill stood when he saw Officer Rigdon and pulled up his pants. McGill told Officer Rigdon that he and C.S. were having sex. C.S. was crying and was "pretty hysterical."

C.S. was transported to Fairbanks Memorial Hospital where she was examined by a nurse. The nurse found that C.S. had injuries consistent with non-consensual sex. The grand jury indicted McGill on one count of first-degree sexual assault.

*Discussion*

*The admissibility of McGill's prior bad acts*

C.S. testified at trial that she met Sandra Davis, McGill's girlfriend, at a bar where they spent the evening of November 6 drinking. C.S. also had a small amount of crack cocaine. Not long before the 2:00 a.m. bar closing, C.S. and Davis went to Davis's apartment. McGill arrived there a short time later, and McGill and Davis immediately began arguing. Davis told McGill to leave and picked up the phone, but McGill took the phone from her. Davis left the apartment stating that she would call the police.

McGill left the apartment. C.S. followed McGill, apparently because she had no other way to get home and wanted to share a cab with him. McGill entered another apartment building nearby, purportedly to use a friend's phone. After C.S. and McGill entered the other building, McGill grabbed C.S. by the legs, pulled her onto the stairs, and sexually assaulted her.

Dayton, whose apartment was adjacent to the stairs, heard a woman "screaming and hollering" and hitting up against the wall. Dayton heard the woman say "get off me" and "somebody please help." At times the woman's voice was muffled, as if someone was covering her mouth. Dayton also heard a male voice say "wait, wait, I'm almost done." Dayton testified that she hesitated for a few minutes before calling the police because she did not want to get involved.

McGill defended by claiming that C.S. consented to have sex with him in exchange for crack cocaine. McGill called Davis to the stand. Davis testified that after McGill arrived at her apartment, C.S. sat on McGill's lap and kissed him. Davis said McGill rebuffed C.S., but that C.S. persisted. Davis said she became upset and told McGill and C.S. to leave and threatened to call the police. McGill took the phone from her and put it outside her door. Davis then went upstairs and asked her neighbor to call the police.

During direct examination, McGill questioned Davis about a domestic violence restraining order she had obtained against McGill:

*Defense attorney:* Now, did Mr. McGill enter your house without permission last year, last May I believe?

*Davis:*        Yes.

. . . .

*Defense attorney:* And were you home when this happened?

*Davis:*        No.

*Defense Attorney:* Were the police called when you got home?

*Davis:*        Yes.

---

1.  AS 11.41.410(a).

*Defense Attorney:* And by virtue of that incident, did you secure what's called a domestic violence restraining order?

*Davis:* Yes.

. . . .

*Defense Attorney:* Did the order [stay] in effect from that time through at least November?

*Davis:* No, I dropped it.

*Defense Attorney:* Do you know whether you were successful in dropping it or not?

*Davis:* Yes, I was.

The State sought to impeach Davis's credibility and establish her bias by questioning Davis about the application she filed in support of the restraining order. The application described incidents where McGill had assaulted her. The State also planned to ask about McGill's threats against Davis after she obtained the protective order. Superior Court Judge Charles R. Pengilly ruled that this evidence was admissible to establish Davis's bias and attack her credibility. Judge Pengilly also ruled that this evidence cured the impression created during Davis's direct examination that Davis had obtained a protective order against McGill because of one relatively benign incident of criminal trespass. Judge Pengilly asked McGill if he wanted a limiting instruction on the permissible use of this evidence and McGill said that he did.

The State queried Davis about three incidents of domestic violence by McGill that Davis described in the application for the restraining order: the trespass in July 1997 that prompted her request for a restraining order; her claim that in May 1997, McGill poured beer on her, pushed her, and covered her mouth so she could not cry for help; and her claim that in March 1997 McGill hit her, pulled her hair, and told her to be quiet or "I'll hurt you." Davis admitted on cross-examination that McGill had poured beer on her, pulled her hair, and threatened to hurt

her if she did not keep quiet, but said that she either could not remember or had lied to the police about the other incidents.

Davis also denied that she had problems with McGill after the restraining order was issued. The State then questioned Davis about her statements to the police that McGill had threatened her and asked her to drop the restraining order. Davis said she did not remember those incidents because she had been drinking. Davis did admit, contrary to her claim on direct examination, that the restraining order was still in effect on November 7.

■ McGill does not dispute that Davis's prior statements to the police about his domestic violence were admissible under Evidence Rule 613(a) to impeach Davis's claim that the relationship was peaceful. But he argues that the evidence was not relevant for two other purposes relied on by the court: to establish Davis's bias and to correct a misleading impression created by McGill's questioning of Davis that the restraining order was issued because of one trespass. He also argues that the court admitted far more detail regarding McGill's conduct than was necessary for the jury to assess Davis's credibility, and that this additional evidence should have been excluded as cumulative and unduly prejudicial under Evidence Rule 403.[2] However, the court gave the jury a limiting instruction, as McGill had requested, on the permissible uses of this impeachment evidence. The jury is presumed to follow a court's limiting instruction.[3]

■ Judge Pengilly could reasonably conclude that Davis's direct testimony created a misleading view of her relationship with McGill. Allowing the State to question Davis about McGill's domestic violence described in the application was permissible cross-examination to impeach Davis and explore her motivation to fabricate. Decisions regarding the admissibility of evidence and the scope of cross-examination are largely within a trial

---

**2.** A.R.E. 403 provides:

Although relevant, evidence may be excluded if its probative value is outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by consider-

ations of undue delay, waste of time, or needless presentation of cumulative evidence.

**3.** *See State v. McDonald,* 872 P.2d 627, 654–55 (Alaska App.1994) (citing *Whiteaker v. State,* 808 P.2d 270, 277 (Alaska App.1991)).

court's discretion and this court will not overturn the trial court's rulings absent an abuse of discretion.[4] From our review of the record, we conclude that Judge Pengilly did not abuse his discretion when he admitted this evidence for these purposes and provided the jury with a limiting instruction.

Judge Pengilly also ruled that, under Evidence Rule 404(b)(3),[5] Davis could be cross-examined about another incident Davis described in the protective order application: her report that McGill had sexually assaulted her in 1994. Evidence Rule 404(b)(3) permits courts to admit evidence of prior sexual assaults in a prosecution for sexual assault if the defendant claims the sex was consensual.

■ McGill contends that Evidence Rule 404(b)(3) is unconstitutional on its face because it violates the due process guarantee of the Alaska Constitution[6] by permitting juries to infer from proof of a prior sexual assault that the defendant has a propensity to commit sexual assault. McGill also argues that admission of propensity evidence under Rule 404(b)(3) violates his constitutional right not to be held to answer for a crime unless it is charged by indictment or information.[7] McGill did not raise these claims below, so we review them for plain error.[8]

■ We have rejected similar claims in other cases. First, in *Allen v. State*,[9] we held that the admission of propensity evidence does not *per se* violate due process because it is not "invariably so prejudicial as to destroy any possibility of a fair trial."[10] We reasoned that judicial discretion to exclude propensity evidence that was more prejudicial than probative was adequate to protect defendants' due process rights.[11] *Allen* involved a constitutional challenge to Rule 404(a)(2), which permits courts to admit evidence of a defendant's character for violence to rebut a claim that the victim was the first aggressor.[12] But in *Wardlow v. State*,[13] we followed our reasoning in *Allen* to reject a similar due process challenge to Rule 404(b)(3).[14]

■ Next, McGill claims that Rule 404(b)(3) violates his right not to be held to answer for a crime unless it is charged by indictment or information. We rejected that argument in *Fuzzard v. State*.[15] Although *Fuzzard* addressed a constitutional challenge to Evidence Rule 404(b)(4),[16] which allows courts to admit evidence of prior domestic violence to show a propensity for domestic violence, the analysis applies with equal force to Rule 404(b)(3).

Finally, McGill attacks Rule 404(b)(3) by citing *State v. Burns*.[17] In *Burns*, the Mis-

4. *See Hawley v. State*, 614 P.2d 1349, 1361 (Alaska 1980); *Johnson v. State*, 889 P.2d 1076, 1080 (Alaska App.1995).

5. A.R.E. 404(b)(3) provides:

In a prosecution for a crime of sexual assault in any degree, evidence of other sexual assaults or attempted sexual assaults by the defendant against the same or another person is admissible if the defendant relies on a defense of consent. In a prosecution for a crime of attempt to commit sexual assault in any degree, evidence of other sexual assaults or attempted sexual assaults by the defendant against the same or another person is admissible.

6. *See* Alaska Const. art. 1, § 7.

7. *See* Alaska Const. art. 1, § 8.

8. *See Gilbert v. State*, 598 P.2d 87, 92 (Alaska 1979); (*see also* Alaska R.Crim.P. 47(b)) (error not brought to the attention of the trial court will not be noticed on appeal unless it affects a substantive right and is obviously prejudicial).

9. 945 P.2d 1233 (Alaska App.1997).

10. *Id.* at 1238.

11. *See id.* at 1239.

12. *See id.* at 1236.

13. 2 P.3d 1238 (Alaska App.2000).

14. *See id.* at 1248.

15. 13 P.3d 1163, 1167 (Alaska App.2000).

16. A.R.E. 404(b)(4) provides in part:

In a prosecution for a crime involving domestic violence or of interfering with a report of a crime involving domestic violence, evidence of other crimes involving domestic violence by the defendant against the same or another person or of interfering with a report of a crime involving domestic violence is admissible.

17. 978 S.W.2d 759 (Mo.1998).

souri Supreme Court invalidated a statute that mandated admission of prior acts of child molestation because the court ruled that the statutory mandate violated the Missouri Constitution.[18]

■ Alaska Evidence Rule 404(b)(3) does not mandate admission of bad acts evidence.[19] Moreover, this court has held, unlike the Missouri high court, that the traditional ban on propensity evidence is not rooted in the constitution, and that any potential for abuse of character evidence can be adequately addressed by the rules of evidence.[20] We conclude that McGill has not shown any error, much less plain error.

■ Judge Pengilly also ruled that on cross-examination, the State could ask McGill about the same prior acts of McGill's that the State used to impeach Davis during her cross-examination. McGill argues that this was an abuse of discretion. However, the State permissibly questioned Davis about these same matters to impeach her and question her bias. Certainly, the repetition of those points with McGill was cumulative, but even if this was an abuse of discretion, we are satisfied from our review of the record that any potential error would not have affected the jury's verdict.[21]

*The court's instruction on withdrawn consent*

During deliberations, the jury sent a note to Judge Pengilly. The note asked: "While engaged in sexual penetration, if one or another of the parties involved says 'stop,' does consent for sex terminate at this point?" The court answered: "Consent to sexual penetration may be withdrawn. You are reminded, however, that all elements of Sexual Assault in the First Degree must be proven beyond a reasonable doubt before any defendant can be convicted on that charge." The

court also directed the jury's attention to the instructions defining the elements of first-degree sexual assault.

■ McGill contends that this instruction is an inaccurate statement of our law. However, we question whether McGill adequately preserved an objection to this instruction. When the parties met to discuss the jury's question, the prosecutor expressed the view that the answer to the jury's question was "yes," that consent to sexual penetration could be withdrawn after initial penetration. Judge Pengilly agreed with the State, but McGill responded that he was "not sure" because he had not "had time to research this."

Judge Pengilly responded that the law appeared to be clear that even if there was consent initially, that consent could be withdrawn. Judge Pengilly asked McGill if he agreed with that proposition. McGill answered "I don't know." McGill did request that the jury be reminded that the State had to prove all the elements of the offense. Judge Pengilly then answered the jury's question with the instruction described above. We conclude that McGill's colloquy with Judge Pengilly over this instruction did not preserve an objection.[22]

■ Because McGill did not preserve an objection to this instruction, he must show plain error. Plain error is established if the jury instruction creates a high likelihood that the jury will follow an erroneous theory that results in a miscarriage of justice.[23]

McGill cites a trio of out-of-state cases that hold that if consent to sexual intercourse is withdrawn after sexual penetration, that fact pattern cannot sustain a conviction for rape. The first member of this trio is *State v. Way*.[24] In *Way*, the jury asked the trial court

---

**18.** *See id.* at 760, 762.

**19.** *See Wardlow,* 2·P.3d at 1248.

**20.** *See Allen,* 945 P.2d at 1239.

**21.** *See Love v. State,* 457 P.2d 622, 629–31 (Alaska 1969).

**22.** *See* Alaska R.Crim.P. 30(a) ("No party may assign as error any portion of the charge [to the

jury] or omission therefrom unless the party objects thereto ... stating distinctly the matter to which the party objects and the grounds of the objections.").

**23.** *See Nelson v. State,* 927 P.2d 331, 334 (Alaska App.1996).

**24.** 297 N.C. 293, 254 S.E.2d 760 (1979).

"whether consent can be withdrawn." [25] The trial court instructed the jury that "consent initially given could be withdrawn and if the intercourse continued through use of force or threat of force and that the act at that point was no longer consensual this would constitute the crime of rape." [26] The North Carolina Supreme Court reversed and stated as follows, without explanation or citation to authority:

> If the actual penetration is accomplished with the woman's consent, the accused is not guilty of rape, although he may be guilty of another crime because of his subsequent actions.[27]

The next member of the trio is *Battle v. State*.[28] In *Battle*, the Maryland appeals court reached the same result as in *Way*, also without citing authority, by stating as follows:

> Given the fact that consent must precede penetration, it follows in our view that although a woman may have consented to a sexual encounter, even to intercourse, if that consent is withdrawn prior to the act of penetration, then it cannot be said that she has consented to sexual intercourse. On the other hand, ordinarily if she consents prior to penetration and withdraws consent following penetration, there is no rape.[29]

The final case McGill cites is *People v. Vela*,[30] a California court of appeals case where the court reasoned that "if consent is given at the moment of penetration, that act of intercourse will be shielded from being a rape even if consent is later withdrawn during the act." [31] In reaching this conclusion, the California court first noted that under the California Penal Code, rape may be defined as "nonconsensual sexual intercourse" [32] and that "[a]ny penetration, however slight, is sufficient to complete the crime." [33] The court observed that sexual intercourse with a dead person is not rape because "at the moment of sexual penetration there is no outrage to the feelings of the dead victim." [34] The court then concluded that "the essence of the crime of rape is the outrage to the person and feelings of the female resulting from the nonconsensual violation of her womanhood." [35] The court opined that if a woman withdraws consent during intercourse and the man forcibly continues without interruption,

> the female may certainly feel outrage because of the force applied or because the male ignores her wishes, but the sense of outrage to her person and feelings could hardly be of the same magnitude as that resulting from an initial nonconsensual violation of her womanhood.[36]

These cases (and their reasoning, or lack of it) have been criticized. A recent California court of appeals decision declared the *Vela* decision "unsound" because it failed to apply language in the California Penal Code suggesting that the requirements of rape are met not just at the moment of penetration but "as the act of sexual intercourse is forcibly accomplished against the victim's will." [37] A Connecticut appeals court likewise dismissed the *Vela* decision as "archaic and unrealistic," [38] concluding from legislative history that a similarly worded Connecticut statute providing that "penetration, however slight, [is sufficient] to complete ... inter-

25.  *Id.* at 761.

26.  *Id.*

27.  *Id.* at 762.

28.  287 Md. 675, 414 A.2d 1266 (App.1980).

29.  *Id.* at 1270.

30.  172 Cal.App.3d 237, 218 Cal.Rptr. 161 (1985).

31.  *Id.* at 164.

32.  *Id.* (citing Cal.Penal Code, § 261).

33.  *Id.* (quoting Cal.Penal Code, § 263).

34.  *Id.* at 164–65 (citing *People v. Stanworth*, 11 Cal.3d 588, 114 Cal.Rptr. 250, 522 P.2d 1058 (1974)).

35.  *Id.* at 165.

36.  *Id.*

37.  *People v. Roundtree*, 77 Cal.App.4th 846, 91 Cal.Rptr.2d 921, 924 (2000) (citing Cal.Penal Code §§ 261, 263).

38.  *State v. Siering*, 35 Conn.App. 173, 644 A.2d 958, 963 (1994).

course" was not intended to mean that initial penetration constituted intercourse, but to establish the minimum amount of evidence necessary to prove intercourse.[39]

The Supreme Court of Maine rejected the result in *Way* and held that the language of Maine's rape statute—which defines sexual intercourse as "any penetration of the female sex organ by the male sex organ"—supports the conclusion that the continuation of intercourse by compulsion after withdrawal of consent is rape.[40] The court noted that a contrary approach would defy common sense because it would make a rape victim out of a woman whose struggling momentarily displaced the male organ, but not out of a woman under such compulsion by physical force or threat of serious bodily harm that there was no possibility of withdrawal, however brief.[41]

■ Our statutes do not limit "sexual penetration" to the moment of initial penetration. Alaska Statute 11.41.410(a) defines first-degree sexual assault as "sexual penetration" without consent. Alaska Statute 11.81.900(b)(56) defines "sexual penetration" to include genital intercourse, cunnilingus, fellatio, and anal intercourse *or* an intrusion "however slight" of an object or any part of a person's body into the genital or anal opening of another person's body. Thus, Alaska's statutes proscribe a broader range of conduct than genital sexual intercourse. If first-degree sexual assault hinged on proof of nonconsent to the initial sexual penetration—that is, if the victim was required at that moment to be "coerced by the use of force ... [or] threat of death, imminent physical

injury, or kidnapping"[42]—then a defendant who penetrated a sleeping victim but forcefully continued sexual intercourse after the victim awoke would be guilty only of second-degree sexual assault.[43]

■ Nothing in the legislative history of our statute supports McGill's argument that once a person is sexually penetrated with consent, that consent cannot be withdrawn.[44] Also, the case law McGill relies on followed the legislature's enactment of our first-degree sexual assault statute, so the legislature could not have considered those cases when it enacted our statute.[45] Furthermore, the reasoning in those cases is not persuasive. And a view that our sexual assault statute is based on considerations of "outrage" to a victim's "womanhood" not only represents archaic and outmoded social conventions, but fails to recognize the much broader range of conduct proscribed by Alaska's first-degree sexual assault statute. Because this issue is subject to reasonable dispute, such that competent judges and attorneys might reasonably disagree concerning the answer, McGill has not shown plain error.[46]

## Conclusion

The judgment of the superior court is AFFIRMED.

**39.** *Id.* at 962 n. 5 (quoting Conn.Gen.Statutes § 53a–65(2)).

**40.** *See State v. Robinson,* 496 A.2d 1067, 1070–71 & n. 2 (Me.1985).

**41.** *See Robinson,* 496 A.2d at 1071; *Siering,* 644 A.2d at 962.

**42.** AS 11.41.470(8)(A) (defining "without consent").

**43.** *See* AS 11.41.420(a)(3)(B) (offender commits the crime of sexual assault in the second degree by engaging in sexual penetration with a person

the offender knows to be incapacitated); *King v. State,* 978 P.2d 1278, 1279–80 (Alaska App.1999) (a sleeping person is incapacitated for purposes of second-degree sexual assault).

**44.** *See* 1978 Senate Journal, Supp. No. 47 at 22–23.

**45.** *See* ch. 166, § 3, SLA 1978.

**46.** *See Marrone v. State,* 653 P.2d 672, 676 (Alaska App.1982).