[No. S103427. Jan. 6, 2003.]

In re JOHN Z., a Person Coming Under the Juvenile Court Law.
THE PEOPLE, Plaintiff and Respondent, v.
JOHN Z., Defendant and Appellant.

**COUNSEL**

Carol L. Foster, under appointment by the Supreme Court, for Defendant and Appellant.

Bill Lockyer, Attorney General, David P. Druliner and Robert R. Anderson, Chief Assistant Attorneys General, Jo Graves, Assistant Attorney General, Michael J. Weinberg, Stan Cross and John G. McLean, Deputy Attorneys General, for Plaintiff and Respondent.

Wendy J. Murphy, Barbara F. Berenson; Gina S. McClard, Douglas E. Beloof; Bingham McCutchen, Leslie G. Landau and Alison Beck for the Victim Advocacy and Research Group, the National Crime Victim Law Institute, the California Coalition Against Sexual Assault and the National Sexual Violence Resource Center as Amici Curiae on behalf of Plaintiff and Respondent.

**OPINION**

**CHIN, J.**—We granted this case to settle a conflict in Court of Appeal decisions as to whether the crime of forcible rape (Pen. Code, § 261, subd.

(a)(2)) is committed if the female victim consents to an initial penetration by her male companion, and then withdraws her consent during an act of intercourse, but the male continues against her will. (Compare *People v. Vela* (1985) 172 Cal.App.3d 237 [218 Cal.Rptr. 161](*Vela*) [no rape committed] with *People v. Roundtree* (2000) 77 Cal.App.4th 846 [91 Cal.Rptr.2d 921] (*Roundtree*) [rape committed].) We agree with *Roundtree* and the Court of Appeal in the present case that a withdrawal of consent effectively nullifies any earlier consent and subjects the male to forcible rape charges if he persists in what has become nonconsensual intercourse.

The juvenile court, after holding a contested jurisdictional hearing on a unitary petition (Welf. & Inst. Code, §§ 602, 777, subd. (a)) filed on behalf of John Z. (defendant), found that he committed forcible rape (Pen. Code, § 261, subd. (a)(2)) and that his previous juvenile court disposition had been ineffective. (Further undesignated statutory references are to the Penal Code.) He was committed to Crystal Creek Boys Ranch. On appeal, defendant contends the evidence is insufficient to sustain the finding that he committed forcible rape. We disagree.

FACTS

The following facts are largely taken from the Court of Appeal opinion in this case. During the afternoon of March 23, 2000, 17-year-old Laura T. was working at Safeway when she received a call from Juan G., whom she had met about two weeks earlier. Juan wanted Laura to take him to a party at defendant's home and then return about 8:30 p.m. to pick him up. Laura agreed to take Juan to the party, but since she planned to attend a church group meeting that evening she told him she would be unable to pick him up.

Sometime after 6:00 p.m., Laura drove Juan to defendant's residence. Defendant and Justin L. were present. After arranging to have Justin L.'s stepbrother, P. W., buy them alcohol, Laura picked up P. W. and drove him to the store where he bought beer. Laura told Juan she would stay until 8:00 or 8:30 p.m. Although defendant and Juan drank the beer, Laura did not.

During the evening, Laura and Juan went into defendant's parents' bedroom. Juan indicated he wanted to have sex but Laura told him she was not ready for that kind of activity. Juan became upset and went into the bathroom. Laura left the bedroom and both defendant and Justin asked her why she "wouldn't do stuff." Laura told them that she was not ready.

About 8:10 p.m., Laura was ready to leave when defendant asked her to come into his bedroom to talk. She complied. Defendant told her that Juan

had said he (Juan) did not care for her; defendant then suggested that Laura become his girlfriend. Juan entered the bedroom and defendant left to take a phone call.

When defendant returned to the bedroom, he and Juan asked Laura if it was her fantasy to have two guys, and Laura said it was not. Juan and defendant began kissing Laura and removing her clothes, although she kept telling them not to. At some point, the boys removed Laura's pants and underwear and began "fingering" her, "playing with [her] boobs" and continued to kiss her. Laura enjoyed this activity in the beginning, but objected when Juan removed his pants and told defendant to keep fingering her while he put on a condom. Once the condom was in place, defendant left the room and Juan got on top of Laura. She tried to resist and told him she did not want to have intercourse, but he was too strong and forced his penis into her vagina. The rape terminated when, due to Laura's struggling, the condom fell off. Laura told Juan that "maybe it's a sign we shouldn't be doing this," and he said "fine" and left the room. (Although Juan G. was originally a codefendant, at the close of the victim's testimony he admitted amended charges of sexual battery (§ 243.4) and unlawful sexual intercourse (§ 261.5, subd. (b)), a misdemeanor.)

Laura rolled over on the bed and began trying to find her clothes; however, because the room was dark she was unable to do so. Defendant, who had removed his clothing, then entered the bedroom and walked to where Laura was sitting on the bed and "he like rolled over [her] so [she] was pushed back down to the bed." Laura did not say anything and defendant began kissing her and telling her that she had "a really beautiful body." Defendant got on top of Laura, put his penis into her vagina "and rolled [her] over so [she] was sitting on top of him." Laura testified she "kept . . . pulling up, trying to sit up to get it out . . . [a]nd he grabbed my hips and pushed me back down and then he rolled me back over so I was on my back . . . and . . . kept saying, will you be my girlfriend." Laura "kept like trying to pull away" and told him that "if he really did care about me, he wouldn't be doing this to me and if he did want a relationship, he should wait and respect that I don't want to do this." After about 10 minutes, defendant got off Laura, and helped her dress and find her keys. She then drove home.

On cross-examination, Laura testified that when defendant entered the room unclothed, he lay down on the bed behind her and touched her shoulder with just enough pressure to make her move, a nudge. He asked her to lie down and she did. He began kissing her and she kissed him back. He rolled on top of her, inserted his penis in her and, although she resisted, he rolled

her back over, pulling her on top of him. She was on top of him for four or five minutes, during which time she tried to get off, but he grabbed her waist and pulled her back down. He rolled her over and continued the sexual intercourse. Laura told him that she needed to go home, but he would not stop. He said, "just give me a minute," and she said, "no, I need to get home." He replied, "give me some time" and she repeated, "no, I have to go home." Defendant did not stop, "[h]e just stayed inside of me and kept like basically forcing it on me." After about a "minute, minute and [a] half," defendant got off Laura.

Defendant testified, admitting that he and Juan were kissing and fondling Laura in the bedroom, but claimed it was with her consent. He also admitted having sexual intercourse with Laura, again claiming it was consensual. He claimed he discontinued the act as soon as Laura told him that she had to go home.

## DISCUSSION

■ Although the evidence of Laura's initial consent to intercourse with John Z. was hardly conclusive, we will assume for purposes of argument that Laura impliedly consented to the act, or at least tacitly refrained from objecting to it, until defendant had achieved penetration. (But see § 261.6 [defining the type of consent at issue under § 261 as "positive cooperation in act or attitude pursuant to an exercise of free will"].) As will appear, we conclude that the offense of forcible rape occurs when, during apparently consensual intercourse, the victim expresses an objection and attempts to stop the act and the defendant forcibly continues despite the objection.

*Vela, supra*, 172 Cal.App.3d 237, held that where the victim consents to intercourse at the time of penetration but thereafter withdraws her consent, any use of force by her assailant past that point is not rape. (*Id.* at pp. 242-243.) The court in *Vela* found "scant authority" on point (*id.* at p. 241), relying on two out-of-state cases which had held that if consent is given prior to penetration, no rape occurs despite the withdrawal of consent during intercourse itself. (See *Battle v. State* (1980) 287 Md. 675 [414 A.2d 1266, 1268-1270]; *State v. Way* (1979) 297 N.C. 293 [254 S.E.2d 760, 762].) According to *Vela*, these cases held that "the presence or absence of consent at the moment of initial penetration appears to be the crucial point in the crime of rape." (*Vela, supra*, 172 Cal.App.3d at p. 242.)

*Vela* agreed with these cases, reasoning that "the essence of the crime of rape is the outrage to the person and feelings of the female resulting from the nonconsensual violation of her womanhood. When a female willingly consents to an act of sexual intercourse, the penetration by the male cannot

constitute a violation of her womanhood nor cause outrage to her person and feelings. If she withdraws consent during the act of sexual intercourse and the male forcibly continues the act without interruption, the female may certainly feel outrage because of the force applied or because the male ignores her wishes, but the sense of outrage to her person and feelings could hardly be of the same magnitude as that resulting from an initial nonconsensual violation of her womanhood. It would seem, therefore, that the essential guilt of rape as stated in . . . section 263 is lacking in the withdrawn consent scenario." (*Vela, supra*, 172 Cal.App.3d at p. 243.)

With due respect to *Vela* and the two sister state cases on which it relied, we find their reasoning unsound. First, contrary to *Vela*'s assumption, we have no way of accurately measuring the level of outrage the victim suffers from being subjected to continued forcible intercourse following withdrawal of her consent. We must assume the sense of outrage is substantial. More importantly, section 261, subdivision (a)(2), defines rape as "an act of sexual intercourse accomplished with a person not the spouse of the perpetrator . . . . [¶] . . . [w]here it is accomplished against a person's will by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the person or another." Nothing in section 261 conditions the act of rape on the degree of outrage of the victim. Section 263 states that "[t]he essential guilt of rape consists in the outrage to the person and feelings of the victim of the rape. Any sexual penetration, however slight, is sufficient to complete the crime." But no California case has held that the victim's outrage is an element of the crime of rape.

In *Roundtree, supra*, 77 Cal.App.4th 846, the court recognized that, by reason of sections 261 and 263, "[t]he crime of rape therefore is necessarily committed when a victim withdraws her consent during an act of sexual intercourse but is forced to complete the act. The statutory requirements of the offense are met as the act of sexual intercourse is forcibly accomplished against the victim's will. The outrage to the victim is complete." (*Roundtree, supra*, 77 Cal.App.4th at p. 851.) *Roundtree* cited several cases from other states either criticizing *Vela* or reaching a contrary conclusion. (See *State v. Crims* (Minn.Ct.App. 1995) 540 N.W.2d 860, 865; *State v. Jones* (S.D. 1994) 521 N.W.2d 662, 672; *State v. Siering* (1994) 35 Conn.App. 173 [644 A.2d 958, 963]; *State v. Robinson* (Me. 1985) 496 A.2d 1067, 1071; see also *McGill v. State* (Alaska Ct.App. 2001) 18 P.3d 77, 84 [*Vela*'s view that sexual assault statute is based on considerations of " 'outrage' " to victim's " 'womanhood' " represents "archaic and outmoded social conventions"]; Note, *Post-Penetration Rape—Increasing the Penalty* (1991) 31 Santa Clara L.Rev. 779, 804-808 [criticizing *Vela* and advocating legislation to punish forcible and nonconsensual postpenetration intercourse as second degree rape].)

As the Court of Appeal in this case stated, "while outrage of the victim may be the cause for criminalizing and severely punishing forcible rape, outrage by the victim is not an element of forcible rape. Pursuant to section 261, subdivision (a)(2) forcible rape occurs when the act of sexual intercourse is accomplished against the will of the victim by force or threat of bodily injury and it is immaterial at what point the victim withdraws her consent, so long as that withdrawal is communicated to the male and he thereafter ignores it."

In the present case, assuming arguendo that Laura initially consented to, or appeared to consent to, intercourse with defendant, substantial evidence shows that she withdrew her consent and, through her actions and words, communicated that fact to defendant. Despite the dissent's doubt in the matter (dis. opn., *post,* at pp. 764-765, 767), no reasonable person in defendant's position would have believed that Laura continued to consent to the act. (See *People v. Williams* (1992) 4 Cal.4th 354, 360-361 [14 Cal.Rptr.2d 441, 841 P.2d 961] [requiring reasonable and good faith belief, supported by substantial evidence, that the victim voluntarily consented to intercourse]; cf. CALJIC No. 10.65 [same].) As the Court of Appeal below observed, "Given [Laura's testimony], credited by the court, there was nothing equivocal about her withdrawal of any initially assumed consent."

*Vela* appears to assume that, to constitute rape, the victim's objections must be raised, or a defendant's use of force must be applied, *before* intercourse commences, but that argument is clearly flawed. One can readily imagine situations in which the defendant is able to obtain penetration before the victim can express an objection or attempt to resist. Surely, if the defendant thereafter ignores the victim's objections and forcibly continues the act, he has committed "an act of sexual intercourse accomplished . . . . [¶] . . . against a person's will by means of force . . . ." (§ 261, subd. (a)(2).)

Defendant, candidly acknowledging *Vela*'s flawed reasoning, contends that, in cases involving an initial consent to intercourse, the male should be permitted a "reasonable amount of time" in which to withdraw, once the female raises an objection to further intercourse. As defendant argues, "By essence of the act of sexual intercourse, a male's primal urge to reproduce is aroused. It is therefore unreasonable for a female and the law to expect a male to cease having sexual intercourse immediately upon her withdrawal of consent. It is only natural, fair and just that a male be given a reasonable amount of time in which to quell his primal urge . . . ."

We *disagree with* defendant's argument. Aside from the apparent lack of supporting authority for defendant's "primal urge" theory, the principal

problem with his argument is that it is contrary to the language of section 261, subdivision (a)(2): Nothing in the language of section 261 or the case law suggests that the defendant is entitled to persist in intercourse once his victim withdraws her consent.

In any event, even were we to accept defendant's "reasonable time" argument, in the present case he clearly was given ample time to withdraw but refused to do so despite Laura's resistance and objections. Although defendant testified he withdrew as soon as Laura objected, for purposes of appeal we need not accept this testimony as true in light of Laura's contrary testimony. (E.g., *People v. Johnson* (1980) 26 Cal.3d 557, 578 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255].) As noted above, Laura testified that she struggled to get away when she was on top of defendant, but that he grabbed her waist and pushed her down onto him. At this point, Laura told defendant that if he really cared about her, he would respect her wishes and stop. Thereafter, she told defendant *three* times that she needed to go home and that she did not accept his protestations he just needed a "minute." Defendant continued the sex act for at least four or five minutes after Laura *first* told him she had to go home. According to Laura, after the *third* time she asked to leave, defendant continued to insist that he needed more time and "just stayed inside of me and kept like basically forcing it on me," for about a "minute, minute and [a] half." Contrary to the dissent's concerns (dis. opn., *post*, at pp. 767-768), the force defendant exerted in resisting Laura's attempts to stop the act was clearly ample to satisfy section 261, subdivision (a)(2). (See *People v. Mom* (2000) 80 Cal.App.4th 1217, 1224 [96 Cal.Rptr.2d 172], and cases cited [force "substantially different from or substantially greater than that necessary to accomplish the rape itself"].)

Although the dissent herein would prefer more guidance for future cases, this is an appeal from a juvenile court adjudication rather than a jury trial, and the briefing does not address what pinpoint instructions, if any, might be appropriate in these withdrawn consent cases. Accordingly, we do not explore or recommend instructional language governing such matters as the defendant's knowledge of the victim's withdrawal of consent, the possibly equivocal nature of that withdrawal, or the point in time at which defendant must cease intercourse once consent is withdrawn.

We disapprove *People v. Vela, supra*, 172 Cal.App.3d 237, to the extent that decision is inconsistent with our opinion. The judgment of the Court of Appeal is affirmed.

George, C. J., Kennard, J., Baxter, J., Werdegar, J., and Moreno, J., concurred.

**BROWN, J.,** Dissenting.—A woman has an absolute right to say "no" to an act of sexual intercourse. After intercourse has commenced, she has the absolute right to call a halt and say "no more," and if she is compelled to continue, a forcible rape is committed. Although California's rape statutes are gender neutral, the criminalization of more subtle forms of sexual violence reflects a new view of women as "responsible, autonomous beings who possess the right to personal, sexual, and bodily self-determination." (Berger et al., *The Dimensions of Rape Reform Legislation* (1988) 22 L. & Soc'y Rev. 329, 330.) Thus, both courts and legislatures have expanded the concept of rape to include spousal rape, lesser degrees of rape, and what has been characterized as postpenetration rape. (See, e.g., *McGill v. State* (Alaska Ct.App. 2001) 18 P.3d 77, 84; *State v. Siering* (1994) 35 Conn.App. 173 [644 A.2d 958, 962-963]; *State v. Robinson* (Me. 1985) 496 A.2d 1067, 1070-1071; *State v. Crims* (Minn.Ct.App. 1995) 540 N.W.2d 860, 865.)

To the extent the majority holds the clear withdrawal of consent nullifies any earlier consent and forcible persistence in what then becomes nonconsensual intercourse is rape, not assault and battery as the Court of Appeal held in *People v. Vela* (1985) 172 Cal.App.3d 237, 243 [218 Cal.Rptr. 161], I concur in that portion of its reasoning. However, because the majority ignores critical questions about the nature and sufficiency of proof in a postpenetration rape case, I cannot concur in the rest of the majority opinion. The majority opinion is deficient in several respects. First, the opinion fails to consider whether the victim's statements in this case clearly communicated her withdrawal of consent. Second, there is no attempt to define what constitutes force in this context. Finally, questions about wrongful intent are given short shrift.

The People must prove the elements of a crime beyond a reasonable doubt (Pen. Code, § 1096; U.S. Const., 14th Amend.). As relevant to this case, "Rape is an act of sexual intercourse . . . with a person not the spouse of the perpetrator" "accomplished against a person's will by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the person or another." (Pen. Code, § 261, subd. (a)(2).) Presumably, in a postpenetration rape case, the prosecution still has the burden of showing, beyond a reasonable doubt, that the victim clearly communicated withdrawal of consent and the defendant exercised some degree of force to continue.[1] Moreover, a defendant's reasonable and good faith mistake of fact regarding a person's consent to sexual intercourse is a defense to rape. (*People v. Williams* (1992) 4 Cal.4th 354, 360 [14 Cal.Rptr.2d 441, 841 P.2d 961]; *People v. Mayberry* (1975) 15 Cal.3d 143, 154-155 [125 Cal.Rptr. 745, 542

---

[1] The People did not use the term "postpenetration rape" during the juvenile adjudication. The theory is first articulated by the Court of Appeal.

P.2d 1337].) To be acquitted, a defendant need only raise a reasonable doubt as to his reasonable and honest belief in consent. Thus, to convict in such a case, the People must prove the absence of such a belief *beyond a reasonable doubt.*

Ordinarily, these cases involve a credibility contest in which the victim tells one story, the defendant another. The trial judge in this juvenile matter relied primarily on Laura's testimony and rejected John Z.'s testimony in its entirety. Even so, "assuming arguendo that Laura initially consented to, or appeared to consent to, intercourse with defendant" (maj. opn., *ante*, at p. 762), the facts in this case, as described solely by the prosecution witness, create doubt both about the withdrawal of consent and the use of force.

This is a sordid, distressing, sad little case. From any perspective, its facts are appalling. Laura T., a 17-year-old girl, finds herself alone in a house with four young men, ranging in age from 16 to 21. One of them, Juan, is "sort of" her boyfriend. Laura and Juan met at a bus stop near her workplace and had known each other for about two weeks when they arrived at the "party" at John Z.'s house on March 23, 2000. Laura drove to the party in her own vehicle. She planned to drop Juan off and leave. The other partygoers were unknown to Laura. John Z. was introduced to her after they arrived. Instead of leaving, Laura remained at John Z.'s house for several hours. During the evening she was openly affectionate with Juan, and sporadically engaged in some mutual kissing with John Z.—in the kitchen and later in the master bedroom when Juan was sulking in the bathroom.

This is how she described subsequent events:

Around 8:00 p.m., Laura decided she was ready to leave. Before she walked out the door, John asked if he could talk to her. She walked back into the house and went into his bedroom, which was completely dark. She did not ask to turn on the light. She entered the room willingly and was not restrained from leaving. They sat in the dark, talking. John told her Juan never cared about her, was only "using [her] and anyone else could use [her] too." John said he really liked her; she should dump Juan and become John's girlfriend. When Juan came into the bedroom, Laura confronted him with what John had said. He denied it. The boys asked if she had ever fantasized about having "two guys." Laura said she had not, but she continued to sit on the bed in John's darkened bedroom with both Juan and John while one or both of them removed various items of her clothing. At first, she tried to replace her clothing, but after pulling her bra back into place a couple of times, she made no further efforts to retrieve her clothes. Asked why she did not leave, she responded: "There is no reason. I just didn't. I didn't think

about it. I had already tried to leave once, and they asked me to go in the bedroom and talk."

Feeling there was "no point in fighting" because there was nothing she could do about it anyway, she laid back on the bed, with Juan on one side of her and John on the other. She did not say anything and she was not fighting or resisting while the rest of her clothing was removed. The boys were "fingering" her and playing with her "boobs" and kissing her and "like just trying to like keep me satisfied type of thing." She acknowledged that she enjoyed these activities, enjoyed it "because it was like a threesome"; she was laughing and liked being the center of attention.

After that prelude and after she had intercourse with Juan, which ended when the condom kept falling off and she told him perhaps that was a sign they "shouldn't be doing this," we come to the facts which form the basis of John Z.'s adjudication. According to Laura, she was sitting on the bed naked when John Z. came into the room, naked or partially unclothed. She had been unable to find her clothes in the dark. John sat on the bed behind her and touched her with one hand on her shoulder. He did not pull or push her backward. He nudged her with one hand. His left hand was in a cast. She laid back down on the bed. John began kissing her. She kissed him back. He climbed on top of her and achieved penetration. She did not say anything. She did not push him away, slap him or strike him. He made no threats and he did not hurt her. John asked her repeatedly "will you be my girlfriend?"

He rolled over so she was on top. She remained in that position for four to five minutes. Although he held her only with one hand on her waist—not hard enough for her to feel the pressure or to create a bruise—she was unable to extricate herself or break the connection. There was no conversation when intercourse began and she said nothing while she was on top of him. When she found herself on the bottom again, she said: "If he really did care about me, he wouldn't be doing this to me and if he really did want a relationship, he should wait and respect that I don't want to do this." John responded: "I really do care about you." She never "officially" told him she did not want to have sexual intercourse.

Sometime later she said: "I should be going now." "I need to go home." John said: "Just give me a minute." Several minutes later, she said again: "I need to get home." He said: "[G]ive me some time." She said: "No. I have to go home." The third time she told him she had to go home she was a little more urgent. She never "officially" cried, but she was starting to. When asked if at anytime while having intercourse with John Z., she had told him "no," Laura answers: "No," and repeats her contingent statement. Calling a

halt, her answers suggest, was entirely John Z.'s responsibility. He said he cared about her, "but he still just let it happen."

The majority finds Laura's "actions and words" clearly communicated withdrawal of consent in a fashion "no reasonable person in defendant's position" could have mistaken. (Maj. opn., *ante*, at p. 762.) But, Laura's silent and ineffectual movements could easily be misinterpreted. And, none of her statements are unequivocal. While Laura may have felt these words clearly conveyed her unwillingness, they could reasonably be understood as requests for reassurance or demands for speed. And, Laura's own testimony demonstrates that is precisely how John Z. interpreted what she said. Indeed, Laura demonstrates a similar ambivalence. When asked if she had made it clear to John that she didn't want to have sex, Laura says "I thought I had," but she acknowledges she "never officially told him" she did not want to have sexual intercourse. When asked by the prosecutor on redirect why she told John "I got to go home," Laura answers: "Because I had to get home so my mom wouldn't suspect anything."

Furthermore, even if we assume that Laura's statements evidenced a clear intent to withdraw consent, sexual intercourse is not transformed into rape merely because a woman changes her mind. (*State v. Robinson, supra,* 496 A.2d at p. 1070; *People v. Roundtree* (2000) 77 Cal.App.4th 846, 851 [91 Cal.Rptr.2d 921].) As the majority acknowledges, by reason of Penal Code sections 261 and 263, " '[t]he crime of rape therefore is necessarily committed when a victim withdraws her consent during an act of sexual intercourse but is *forced* to complete the act. The statutory requirements of the offense are met as the act of sexual intercourse is *forcibly* accomplished against the victim's will.' " (Maj. opn., *ante,* at p. 761, quoting *Roundtree,* at p. 851, italics added.) In other words, an act of sexual intercourse becomes rape under these circumstances if all the elements of rape are present. Under the facts of this case, however, it is not clear that Laura was forcibly compelled to continue. All we know is that John Z. did not instantly respond to her statement that she needed to go home. He requested additional time. He did not demand it. Nor did he threaten any consequences if Laura did not comply.

The majority relies heavily on John Z.'s failure to desist immediately. But, it does not tell us how soon would have been soon enough. Ten seconds? Thirty? A minute? Is persistence the same thing as force? (See *People v. Mom* (2000) 80 Cal.App.4th 1217, 1224 [96 Cal.Rptr.2d 172] [suggesting force must be "substantially different from or substantially greater" than that necessary to accomplish the act itself].) And even if we conclude persistence should be criminalized in this situation, should the penalty be the same as for

forcible rape? Such questions seem inextricably tied to the question of whether a reasonable person would know that the statement "I need to go home" should be interpreted as a demand to stop. Under these circumstances, can the withdrawal of consent serve as a proxy for both compulsion and wrongful intent?

The majority finds these deficiencies insignificant because this is a juvenile adjudication. But, if John Z. is convicted of a felony as an adult, the same juvenile adjudication will qualify as a strike. Thus, the absence of a jury or jury instructions cannot justify a lesser standard of proof.

In reviewing a criminal conviction challenged as lacking evidentiary support we review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*People v. Hillhouse* (2002) 27 Cal.4th 469, 496 [117 Cal.Rptr.2d 45, 40 P.3d 754].) Presumably, in determining guilt beyond a reasonable doubt, the juvenile court would have to consider and resolve the same questions the majority declines to address. Because the record contains no indication the juvenile court did so, I respectfully dissent.